**In re FLUTIE NEW YORK CORP. d/b/a Company Management, Debtor.**

**David Kittay, Trustee of the Estate of Flutie New York Corp. d/b/a Company Management, Plaintiff,**

**v.**

**Flutie New York Corp., Albert Flutie, Michael Flutie, Flutie Media Corp., Flutie Interactive, Inc., Flutie Entertainment Corp., Flutie Bros. LLC, and Flutie Entertainment USA, Inc., Defendants.**

Bankruptcy No. 02–14069 (BRL).
Adversary No. 02–03878 (BRL).

United States Bankruptcy Court, S.D. New York.

March 18, 2004.

Storch Amini & Munves, P.C., by Bijan Amini, Alison Coburn, New York City, Special Counsel to David Kittay, Trustee.

Jerome Lee Davidow, by Jerome Lee Davidow, New York City, for Albert Flutie and Michael Flutie.

Seward & Kissel LLP, by Bruce G. Paulsen, John Ashmead, New York City, for Defendant, Flutie Bros. LLC.

## *FINDINGS OF •FACT AND CONCLUSIONS OF LAW PURSUANT TO RULE 7052 OF THE RULES OF BANKRUPTCY PROCEDURE*

BURTON R. LIFLAND, Bankruptcy Judge.

This is an action brought by plaintiff David R. Kittay, Esq., as the duly appointed chapter 7 trustee (the "Trustee"), pursuant to section 701 of title 11, United States Code (the "Bankruptcy Code"), for the estate of Flutie New York Corp. d/b/a Company Management (hereinafter "Flutie N.Y." or the "Debtor") against Flutie New York Corp.,[1] "Albert Flutie", Michael Flutie ("Michael" or "Michael Flutie"), Flutie Media Corp. ("Flutie Media"), Flutie Interactive, Inc. ("Flutie Interactive"), Flutie Entertainment Corp. ("Flutie Entertainment"), Flutie Bros. LLC ("Flutie Bros") and Flutie Entertainment USA, Inc. ("Entertainment USA" and, together with Flutie N.Y., Albert Flutie, Michael Flutie, Flutie Media, Flutie Interactive, and Flutie Entertainment, the "Defendants").

The Trustee, in his complaint (the "Complaint"), seeks to avoid certain transfers from the Debtor as fraudulent, redress alleged breaches of fiduciary duties by Albert Flutie and Michael Flutie, recover damages for certain alleged wrongful actions of the Debtor and Michael Flutie and hold Michael Flutie and Albert Flutie personally liable for losses incurred by the Debtor.

More specifically, the Complaint asserts fourteen causes of action:

> Counts I through V charge all Defendants with fraudulent transfers under the Bankruptcy Code and New York Debtor and Creditor Law; Count VI charges Albert Flutie with breaching his fiduciary duty to the Debtor; Count VII charges Michael Flutie with breaching his fiduciary duty to the Debtor; Count VIII seeks a claim for contribution against Michael Flutie and Albert Flutie; Count IX charges Michael Flutie with unjust enrichment; Count X charges Michael Flutie with tortious interference with contract; Count XI seeks a declaratory judgment that Michael Flutie and Albert Flutie are the

---

1. Sued nominally as a transferor of assets in the fraudulent transfer counts of the Complaint.

alter egos of the Debtor and are therefore, liable for all of the Debtor's debts; Count XII seeks a declaratory judgment that Flutie Media is the alter ego of the Debtor and Michael Flutie and therefore, is liable for all of the Debtor's debts; Count XIII seeks an accounting, from the Defendants, of all contracts and other assets transferred out of the Debtor's estate since January 1, 1998; and Count XIV seeks injunctive relief against Michael Flutie, Albert Flutie, Flutie Media, Flutie Interactive, Flutie Entertainment, Flutie Bros and Entertainment USA.

Trial was conducted before the Court on October 27 and 28, 2003, and closing arguments were heard on November 25, 2003. Each party was provided with the opportunity to hear from any proffered witnesses, and approximately 113 exhibits were entered into evidence. Having considered all of the evidence, testimonial and documentary, as well as the arguments of the parties, and their Proposed Findings of Fact and Conclusions of Law, and keeping in mind that a court should not blindly accept findings of fact and conclusions of law proffered by the parties, *St. Clare's Hospital and Health Center v. Insurance Company of North America (In re St. Clare's Hospital and Health Center)*, 934 F.2d 15 (2d Cir.1991)(citing *U.S. v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964)), and having conducted an independent analysis of the law and the facts, this Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### Background

1. On August 21, 2002 (the "Petition Date"), Flutie N.Y. New York Corp., doing business as Company Management, filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

2. On or about August 21, 2002, the United States Trustee appointed David R. Kittay, Esq. as the chapter 7 trustee pursuant to section 701 of the Bankruptcy Code.

3. The Trustee commenced this adversary proceeding on December 20, 2002. The Trustee, through a number of claims, effectively seeks to hold the Defendants liable for the debts of the estate, and the return of monies transferred to the Defendants.

4. The bar date for filing claims in this case was January 10, 2003. Twenty-five claims have been filed against this estate in the amount of $2,746,039, including $60,906 in unsecured claims, $86,873 in priority claims and $2,602,910 in unspecified claims. Such amounts do not include administrative claims—principally professional fees and expenses—that have accrued since the inception of this case.

### The Parties

5. Plaintiff David Kittay is the Trustee of the chapter 7 estate of the Debtor.

6. The Debtor is a corporation organized under the laws of New York. Prior to the Petition Date, the Debtor maintained its principal place of business at 270 Lafayette Street, New York, New York from approximately 1996 to 2003 when Victoria Suns d/b/a Company Models ("Victoria Suns") and the remaining Flutie entities moved into office space located at 17 Little West 12th Street, New York, New York.

7. The Debtor was a model management company principally engaged in the representation of fashion models, serving as their personal manager and promoter for all purposes, including for representation of its clients in the "entertainment business." [Trustee Trial Ex. 52]. Among

the models Debtor represented were Jaime King (a/k/a James), Kristine Szabo, Beri Smither, Rhea Durham, and Alexis Bledel. The Debtor received compensation in two ways: first, it received a standard 20% production fee; and second, it received an additional 20% commission from the models. [Trial Trans. at 70 (Day 1)].

8. The Debtor was known in the industry as Company Management.

9. Defendant Michael Flutie was the principal of the Debtor.

10. The Trustee alleges that Michael Flutie is the disclosed or undisclosed principal behind each of the Flutie entity defendants, and has used these entities principally to promote his personal interests, including extensive payment of his personal expenses and promotion of his family interests at the expense of the Debtor and its creditors. The Defendants, however, assert that Michael Flutie's only transgression was to keep sloppy books, and that a succession of businesses that followed abandonment of the Debtor did not constitute successors-in-interest.

11. Defendant Albert Flutie is the father of Michael Flutie. Albert Flutie was nominally the 100% shareholder and President of the Debtor. Although Albert Flutie was the signatory to the chapter 7 bankruptcy petition that was filed in this Court on behalf of the Debtor, as set forth below, he exerted no control over or involvement in the Debtor.

12. Defendants Flutie Media, Flutie Interactive and Flutie Entertainment, despite being served, defaulted on the Complaint herein.

13. Defendant Flutie Bros is a Delaware limited liability company, organized in or about 1999. As set forth in further detail below, in or about January 2003, Flutie Bros was merged into Flutie Entertainment USA, Inc. [Trial Trans. at 171 (Day 2)] and by stipulation of the parties, Flutie Entertainment USA, Inc. was added as a defendant to this action as the successor in interest to Flutie Bros.

*Flutie New York*

14. Prior to forming Flutie N.Y., Michael Flutie created MFME Model Management Company ("MFME") in approximately 1990. [Trial Trans. 145–146 (Day 1)]. MFME was a model management company which used "Company Management" as a d/b/a for representing models. MFME was also located at 270 Lafayette Street. [Trial Trans. at 147 (Day 1); Trustee Trial Ex. 90].

15. MFME filed a chapter 11 bankruptcy petition on April 25, 1997. [Trustee Trial Ex. 90]. Prior to filing the petition, in or around 1995, Victoria Flutie, Michael's mother, suggested to Michael Flutie that they create a company called Flutie N.Y. which would continue using the "Company Management" name. [Trial Trans. at 148 (Day 1)].

16. By letter that Michael Flutie claims was executed on September 25, 1995, Michael Flutie entered into a license agreement with Flutie N.Y. ("License Agreement"), for the name "Company Management." Pursuant to the terms of the agreement, Michael Flutie was to receive $100,000 per year for the first two years of use in consideration for the non-exclusive use of the name "Company Management" for the purpose of conducting business in the area of model and talent management. The License Agreement was renewable for four additional terms at an increased payment. [Trustee Trial Ex. 28]. Despite the fact that the License Agreement appears to be notarized by Ronald Ferguson, an employee of Flutie N.Y., on September 25, 1995, there is no signature by the notary as required by New York law. [Trustee Trial Ex. 28].

The bona fides of this document are highly suspect.

17. Michael Flutie testified that he never received any consideration as required under the License Agreement. However, the general ledger of Flutie N.Y. does not reflect the licensing payments as a liability. [Trial Trans. at 241–242 (Day 1); Trustee Trial Exs. 2–4]. Moreover, the company's tax returns do not indicate any debt of such nature or amount from Flutie N.Y. to Michael Flutie. [Trustee Trial Ex. 10–11].

18. By letter dated April 2, 2001, Michael Flutie purported to terminate the License Agreement ("Termination Letter") for the name Company Management. [Trustee Trial Ex. 27; Trial Trans. at 163 (Day 1)]. Of interest is the fact that the Termination Letter is notarized again by Ronald Ferguson on April 2, 2001, but once again there is no signature by the notary. [Trustee Trial Ex. 27]. Moreover, Michael Flutie testified at trial that Ronald Ferguson was no longer an employee of Flutie N.Y. as of April 2001. [Trial Trans. at 238–240 (Day 1)]. Here again, the bona fides of the letter are questionable.

19. According to Michael Flutie, he owns the rights to the name Company Management and has trademarked the name. [Trial Trans. at 234 (Day 1)]. However, no evidence of such ownership was presented to the Court. In February 1998, Flutie Entertainment filed an application with the Patent and Trademark office for the mark "Company Management" for use in modeling, television and film entertainment. On June 19, 2000, the application, a key indicia of ownership, was abandoned for failure to respond to the examining attorneys inquiries. [Trustee Trial Ex. 126; Trial Trans. at 95–99].

20. In January 2003, after this action was commenced, Michael Flutie attempted, once again to trademark the name Company Management, this time in an individual capacity, for use in model and talent services, "namely managing the careers of individual models and branding, promoting, and supplying models and talent for advertising, fashion, film, and television." It appears from the records that this application is currently pending [Trustee Trial Ex. 125; Trial Trans. at 95–96] in derogation of the rights of the Debtor in the name "Company Management."

21. Michael Flutie has used a series of corporate forms—MFME, Flutie N.Y., Flutie Media, Victoria Suns—to promote his modeling business, with complete disregard for corporate formalities.

22. In 1995, Michael Flutie transferred the assets of MFME to create Flutie N.Y., which performed the same services as MFME, namely model management. In addition, Michael Flutie continued to represent essentially the same models he had represented while running MFME. [Trial Trans. at 148–150 (Day 1)].

23. Flutie N.Y.'s offices were located at 270 Lafayette Street on the same floor and in the same suite as MFME had been located. [Trustee Trial Ex. 90, 127]. Certain clients of Flutie N.Y. appear to have viewed Flutie N.Y. as part of MFME or both companies as simply "Company Management." For example, checks issued by Bloomingdales to Flutie N.Y. were made out to both Company Management and MFME Model Management Company. [Trustee Trial Ex. 104].

24. Michael Flutie was an employee and officer of Flutie N.Y. Despite attempting at trial to make it appear that others ran the company, even testifying that his outside accountant, Robert Mayer ran the company [Trial Trans. at 155 (Day 1)], Michael Flutie exercised complete domination and control over Flutie N.Y.

25. Michael Flutie testified at trial that he "let it be known that he was one of the founders of the company" and that he was the chief executive or the president when he "needed to be." [Trial Trans. at 152–158 (Day 1)]. Indeed, Michael Flutie was responsible for all major decisions involving the company, including financial and managerial decisions. Michael Flutie supervised the employees and was responsible for determining the amount each employee was paid. [Trial Trans. at 33–34, 36–37 (Day 1); Trial Trans. at 9 (Day 2)].

26. Although sought in discovery, no documentation in the records produced demonstrate that Flutie N.Y., or any of the Defendants, followed any corporate formalities. There are no records of any Board of Directors meetings, shareholder meetings or votes. Indeed, Michael Flutie testified at trial that no meetings were ever held. [Trial Trans. at 157 (Day 1)].

27. In April 2001, Michael Flutie transferred the remaining assets of Flutie N.Y. to Flutie Media and then subsequently again to Victoria Suns—without evidence of any proper business purpose and for a complete lack of consideration.

28. The Trustee's expert witness, Jeffrey M. Katz, a certified public accountant and forensic accountant did not testify as to the insolvency of Flutie N.Y. at any one point in time. [Trial Trans. at 111–12 (Day 1)]. However, according to the corporate tax returns of Flutie N.Y. submitted by the Trustee, Flutie N.Y. had income losses, as well as negative retained earnings, on its income statements for 1995, 1996, 1997, 1998 and 2000. [Trustee Trial Exs. 10–11]. The corporate tax returns, in sum, show that the stockholder's equity was:

| Year End | Equity |
|----------|--------|
| 1997 | − 368,727 |
| 1998 | − 610,468 |
| 1999 | − 479,023 |
| 2000 | − 919,466 |

Mr. Katz' report states that, based upon the table above, Flutie N.Y.'s liabilities exceeded its assets at least from December 31, 1997 through December 31, 2000. [Trustee Trial Ex. 119].

29. In addition, Flutie N.Y.'s corporate tax returns show a consistent pattern of losses on its income statements:

| Year | Income/(Loss) |
|------|---------------|
| 1995 | − 116,477 |
| 1996 | − 15,330 |
| 1997 | − 183,141 |
| 1998 | − 205,615 |
| 1999 | − 146,926 |
| 2000 | − 394,747 |

Mr. Katz states that, based upon the losses above, Flutie N.Y. had negative equity almost from the day the corporation was formed. Although tax returns for 1994 were not submitted by Flutie N.Y., based upon an analysis of the available documents Mr. Katz is able to conclude that in 1994 Flutie N.Y. had losses of approximately $53,779. Consequently, Mr. Katz asserts that Flutie N.Y. was undercapitalized since its inception. [Trustee Trial Ex. 119]. The Defendants submitted no evidence and proposed no argument that, in any way, rebut the credible findings of Mr. Katz. Accordingly, I find that Flutie N.Y. was insolvent almost since its inception and remained in the zone of insolvency through the date of the bankruptcy petition.

30. Mr. Katz, on cross examination, acknowledged at trial that he did not attempt to establish the fair value of the assets of Flutie N.Y. [Trial Trans. at 112 (Day 1)]. However, in light of the fact that the principle assets of Flutie N.Y., the model contracts, were not made available to Mr. Katz by the Defendants, his acknowledgment is not surprising and does not contradict the findings in his report in any way. [Trial Trans. 31, 124, 275–276

(Day 1) ]. Despite the Trustee's demand, the Defendants turned over only a few of the estimated 50 to 60 or more contracts. Moreover, Michael Flutie implausibly hedged on the very existence of model contracts. See ¶¶ 32–36 below.

*Improper Transfer of Model Contracts to Other Flutie Entities*

31. Flutie N.Y.'s main asset was its contracts with models it represented and from which it earned commissions. These commissions for the services of the models were the principle source of revenue for Flutie N.Y. Illustrative of the substantial value of the model contracts and the avails of the models' labor and revenue to Flutie N.Y. are the large number of 1099 tax forms produced by the Defendants for 1999 and 2000. In 1999, Company Management[2] distributed money received on account of model services performed by models represented by Flutie N.Y., minus Flutie N.Y.'s commissions, to 62 models in the approximate amount of $4,964,501.97. Similarly, in 2000, Company Management distributed money to 71 models in the approximate amount of $3,116,784.56.[3] [Trustee Trial Ex. 17].

32. Incredibly, Michael Flutie testified during his deposition that Flutie N.Y. did not enter into contracts with models. However, it is clear from the testimony of other Flutie N.Y. employees that many contracts indeed existed. [Trial Trans. at 42 (Day 1) ].

33. Marion Smith, a former management executive of the Debtor, testified at trial that Flutie N.Y. had contracts with models and that these contracts were kept in a black binder that was kept in her office under "lock and key." Marion Smith testified that it was common practice for the Debtor to have contracts with models.[4] Flutie N.Y., in fact, had created a printed form contract. [Trial Trans. at 37, 42 (Day 1) ].

34. Marion Smith further testified at trial that in October 2000, around the time Marion Smith left the company, approximately 55 to 60 out of the 75 models at Flutie N.Y. had written contracts. Most of the contracts had durations of at least two years, and many were secured by Marion Smith shortly before her departure. [Trial Trans. 31, 275–276 (Day 1) ].

35. Defendants failed to produce virtually any of the models' contracts with Flutie N.Y.

36. Despite Defendants' claim that any Flutie N.Y. files that would contain model contracts were kept in the basement of 270 Lafayette Street and were subsequently destroyed due to a flood, Marion Smith testified that no model contracts were kept in the basement. [Trial Trans. at 43 (Day 1) ].

37. In 1999, Michael Flutie formed Flutie Media which started as a public relations business for other companies, as well as the Flutie N.Y. models. [Trial Trans. at 38, 158 (Day 1) ]. Flutie Media shared office space with Flutie N.Y. at 270 Lafayette Street, Suite 1400 and was owned by Albert Flutie and then later by Michael Flutie. [Trial Trans. at 40, 202 (Day 1) ]. Flutie Media did publicity for

---

2. On the 1099 forms submitted as Trustee Trial Ex. 17, the name of the payer is listed as Company Management, which is the Flutie N.Y. d/b/a.

3. These amounts were calculated by tallying the amounts shown as paid to the models on the 1099 forms.

4. In later testimony Marion Smith stated that model contracts were not always rigidly enforced in the model management industry. [Trial Trans. at 261 (Day 1) ]. As discussed below, however, the credibility of Marion Smith's later testimony is seriously in doubt.

Company Management and other companies. [Trial Trans. at 159 (Day 1) ].

38. In addition to sharing office space, Flutie Media shared office equipment, vendor accounts, insurance policies and employees with Flutie N.Y. [Trial Trans. at 41–42 (Day 1) ].

39. Although Michael Flutie testified that he worked at Flutie Media after 1999, his tax returns do not reflect that he received any salary from Flutie Media. [Trustee Trial Exs. 5–7]. In fact, the only salary he earned was from Flutie N.Y. and even after Michael Flutie formed Flutie Media, he continued to work for Flutie N.Y. Indeed, Michael Flutie testified at trial that he remained "in a visible capacity in a lot of ways present within Flutie N.Y." even after he started Flutie Media. [Trial Trans. at 161 (Day 1) ].

40. At the end of April, 2001, Flutie N.Y. began winding down its operation and Michael Flutie allegedly took back the license for the name Company Management and permitted Flutie Media to begin using the name Company Management. [Trial Trans. at 162, 164 (Day 1) ].

41. At least 20 or more models were represented by Flutie N.Y. during the period of the winding up of Flutie N.Y.—the majority of the models were most likely under contract. [Trial Trans. 31, 275–276 (Day 1); Trustee Trial Ex. 17].

42. As a result of the closure of the Flutie N.Y. business, Flutie Media began to represent models, including Kristine Szabo, as well as its former public relations clients. [Trial Trans. at 164–165 (Day 1) ]. At least 20 or more of the models who were represented by Flutie N.Y. began working for Michael Flutie at Flutie Media. [Trustee Trial Ex. 115].

43. After April 2001, Flutie Media, under the name of Company Management, continued to send models on jobs to exist-ing clients from which they would earn a commission which would be paid to Flutie Media. [Trial Trans. at 165–167 (Day 1) ]. These clients included Macys, Lord & Taylor, Neiman Marcus, Talbots, Chicos, Brooks Brothers and Bloomingdales, among others. [Trustee Trial Exs. 54, 56, 101, 104].

44. By way of example, on January 30, 2002, Kristine Szabo rendered her services, as a model, to Macys East and the invoice that was sent to Macys East was a Company Management invoice (the "Invoice"). [Trustee Trial Ex. 101]. On February 1, 2002, Kristine Szabo performed another job for Macy's East, however, this time the invoice was sent by an entity entitled "Company" which was located at 270 Lafayette Street, Suite 1400, New York, New York (the "Second Invoice"). Attached to the Second Invoice is a Model Release issued by Company Management dated February 1, 2002, which specifically states that any separate negotiations with regards to the services of Kristine Szabo "are to be made solely and exclusively through Michael Flutie and/or Flutie New York Corp. or any of their designated assignees, agents or representatives." [Trustee Trial Ex. 101].

45. During this same time, Flutie Media began to pay the employees of Flutie N.Y., including its bookkeeper Cynthia Quintana [Trial Trans. at 181 (Day 1); Trustee Trial Ex. 45].

46. In or around April 2001, during the alleged winding down period, Michael Flutie opened a bank account for Flutie Media at Chase Manhattan Bank and began to deposit checks made out to Company Management into the Chase account. Michael Flutie or someone under his control would endorse the checks "Flutie Media d/b/a Company Management." [Trustee Trial Exs. 70, 104–105].

47. Flutie Media stopped doing business at the end of 2001. [Trial Trans. at 167–168 (Day 1)].

48. In early 2002, Michael Flutie began to operate his modeling company under a new corporate entity, Victoria Suns—also doing business as Company Model. [Trial Trans. at 168–170 (Day 1)]. Michael Flutie was the sole owner of Victoria Suns. [Trial Trans. at 202 (Day 1)].

49. Victoria Suns had approximately 10 to 12 models under management. Models represented by Victoria Suns included Kristine Szabo, who Michael Flutie has represented as a personal manager since 1998 [Trial Trans at 64–67 (Day 1)], as well as Beri Smithers and Jaime King, both of whom had been represented by Flutie N.Y. [Trial Trans. at 170–175, 177 (Day 1)].

50. Other former Flutie N.Y. models represented by Victoria Suns included: Siew Longhorn, Carina Wretman, Megan Shoemaker, Esther de Jong, Monica Wyngate Lana, Ogilvie, Jennifer Coleman, Kristen Ritter, Molly McLarney, Sonia Gardner, Leslie Navajas, Sian McLaine, and Anouk Dirkse. [Trustee Trial Exs. 21, 71–2, and 107–8].

51. Michael Flutie claims that beginning in mid–2003, continuing to operate Victoria Suns, he switched to a different business model. The new business plan was to manage only the individual models and not work on the individual jobs or on invoicing. Michael Flutie advised the models on different agencies who could handle their print work and accompanied the models on meetings with different agencies who would take over their representation. He assisted, as "mother agent", in the placement of Kristine Szabo, Beri Smithers, Esther Young and Megan Shoemaker with other agencies but still acted as their personal manager. [Trial Trans. at 67, 72 (Day 1); Trustee Trial Ex. 56].

52. Michael Flutie continues to earn commissions on their work acting as their personal manager. [Trial Trans. at 172–173 (Day 1)].

53. For example, in 2003, Kristine Szabo entered into a contract with Next Model Management which allows for Michael Flutie to earn 7% of her net earnings. [Trial Trans. at 67–68, 173 (Day 1), Trial Trans. at 25–27 (Day 2)]. Beri Smithers also entered into a contract with Next Model Management which allows for Michael Flutie to earn 10% percent of her net earnings. [Trial Trans. at 25–27 (Day 2)]. Esther Young entered into a contract with Wilhemina Models which allows for Michael Flutie to earn 10% of her net earnings. [Trial Trans. at 60–61 (Day 2)].

54. Despite the models' placement with other agencies, Michael Flutie continues to oversee any decisions made by Next regarding the jobs for which Ms. Szabo is considered. [Trial Trans. at 82 (Day 1)]. In addition, Michael Flutie still receives commissions on a modeling contract with Nivea that Ms. Szabo signed sometime in 1999 while Flutie N.Y. was still in operation. [Trial Trans. at 68, 83 (Day 1)]. Despite demands therefore, Michael Flutie refused to provide any of the contracts or accounting for her income or any of the other models.

55. Michael Flutie testified at trial that he still represents Jaime King and receives a 5% to 9% commission on her Revlon contract which is approximately $750,000 per year and which he negotiated in 2002. [Trial Trans. at 62–63 (Day 2)].

56. In or around February 2002, Michael Flutie or someone under his control began depositing checks made out to Company Management into a signature bank account at Chase Manhattan, endorsed in the name of "Company." [Trustee Trial Ex. 105].

57. Despite the bankruptcy filing in August, 2002, checks in the name of Company Management for services rendered by models continued to be deposited into the Signature Bank account endorsed in the name "Company." [Trustee Trial Ex. 105]. Indeed, on June 25, 2003, a check was issued by Macys to an entity known as Company Model with an address of 17 Little West 12th Street, New York which was endorsed by "Company" and was deposited into the same Signature account which Company Management checks had been deposited into since February 2002. [Trustee Trial Ex. 105].

58. Kristine Szabo testified at trial that she has been represented by Michael Flutie since 1998 and had, until recently, believed that Michael had worked for Company Management, without distinguishing between Flutie N.Y. or Michael Flutie's successor corporate entities. [Trial Trans. at 65 (Day 1) ]. Even after Flutie N.Y. filed its Chapter 7 petition in August 2002, Kristine Szabo continued to perform modeling jobs and Company Management continued to issue invoices and continued to be paid a commission for these services. [Trial Trans. at 85 (Day 1); Trustee Trial Ex. 101].

59. Throughout her tenure being represented by Flutie N.Y. and then specifically on February 1, 2002, Kristine Szabo continued to use a voucher which was given to her by Michael Flutie with the name "Company Management" at 270 Lafayette Street, New York, New York. These vouchers are used as proof that the model appeared at the specific job and allows for the model agency to get paid. [Trial Trans. at 85 (Day 1); Trustee Trial Ex. 101].

### Michael Flutie's Personal Use of Flutie N.Y.'s Assets

60. Michael Flutie used the assets of Flutie N.Y. for his own personal benefit.

61. For example, it is evident from Flutie N.Y.'s general ledger that the company was paying for the personal expenses of Michael Flutie. In 1999, these expenses included apartment rent in the amount of $44,200, telephone (including wireless) in the amount of $4,382, electric utility bill in the amount of $965, automobile lease in the amount of $2,580, and parking garage fees which totaled $3,110. In addition, there were other car lease payments that were made by Flutie N.Y. that totaled $5,672 that were either for Michael or his father, Albert. In 2000, expenses included his apartment rent in the amount of $6,800, telephone (including wireless) in the amount of $13,270, electric utility bill in the amount of $1,125, automobile lease in the amount of $6,649 and parking garage fees which totaled $2,500. In addition, Flutie N.Y. paid $5,602 on account of automobile insurance, for either the benefit of Michael Flutie or Albert Flutie. [Trustee Trial Exs. 2 and 3; Trial Trans. at 211–214 (Day 1) ].

62. In the first four months of 2001, Flutie N.Y. paid approximately $382 for Michael Flutie's electric utility bill for his apartment, $3,697 for his telephone bill (including wireless) and approximately $1,063 in lease payments for his car. [Trustee Trial Ex. 4].

63. No documentation was ever maintained or produced in this case to support any claim that such expenses were anything but the personal living expenses of Michael Flutie.

64. Flutie N.Y. leased two company cars, which were in Albert Flutie's name and were used by Michael Flutie and Albert Flutie and paid $2,580 in 1999 and $6,649 in 2000 for both. [Trustee Trial Exs. 2–3, 58, 63].

65. Moreover, despite an extravagant and well publicized lifestyle, including a

home in the Hamptons, Michael Flutie's total *declared income was $9,997 in 1999, $43,611 in 2000 and $14,179 in 2001,* all of it from Flutie N.Y. [Trustee Trial Exs. 5–7].

66. Michael Flutie claims he worked for both Flutie Media and Flutie N.Y. from 1999–2001, but his personal tax returns reflect that he only received a salary from Flutie N.Y. in the amount of $9,997 in 1999, $43, 611 in 2000 and $14,179 in 2001. Furthermore, Flutie N.Y. continued paying his personal expenses. [Trustee Trial Exs. 5–7].

67. Michael Flutie contends that he loaned money to Flutie N.Y. that he had borrowed from family and friends in an effort to try to rescue the company, or at least, make good on its debts. No documents were produced evidencing any loans from Michael Flutie. Moreover, Marion Smith, who among her other duties helped Cynthia Quintana with the accounting, never saw any evidence that Michael Flutie had loaned Flutie N.Y. any money. [Trial Trans. at 47 (Day 1) ].

68. The balance sheet of Flutie N.Y. indicates, however, that loans were made from the business to Michael Flutie. The loan balances owed by Michael Flutie totaled $220,247, $273,794, $386,251 and $303,794, for December 31, 1998, December 31, 1999, December 31, 2000, and April 30, 2001, respectively. No documentation was introduced specifying the repayment terms or the interest rates of such loans. In fact, no loan agreement or other document evidencing such loans, beyond entries in Flutie N.Y.'s general ledger, was ever produced during discovery. Furthermore, despite due demand no documents were provided as evidence that the loans had been repaid. [Trustee Trial Exs. 2–4].

69. Michael Flutie charged $126,047 on the Flutie N.Y. American Express bill in 2001, $215,649 on the Flutie N.Y. American Express bill in 2000 and $65,656 on the Flutie N.Y. American Express bill in the second half of 1999. These charges included, but were not limited to, gasoline for his car, hardware and lumber for his house in the Hamptons, a bicycle, groceries, MOMA museum membership, movie tickets, drug store/pharmacy items, liquor, lift tickets for a ski trip to Aspen, Colorado. [Trustee Trial Exs. 18–20].

70. There are no records to show that any of these expenses were business related. The Internal Revenue Service requires that such records be maintained if the expenses are to be legitimately declared as business expenses.

71. Flutie N.Y. paid Robert Mayer, of Mayer & Company, for accounting services provided to various Flutie entities including, Flutie Entertainment, Flutie Media, Flutie Bros., Flutie Interactive, Victoria Suns and VIC LLC. [Trustee Trial Ex. 36]. Robert Mayer testified at trial that he provided Michael Flutie and Flutie N.Y. with accounting services and acted as Michael's business advisor from the early 1990s to 2002. [Trial Trans. at 233 (Day 2) ].

72. Robert Mayer testified that Michael Flutie was supposed to receive compensation in excess of $100,000 annually. However, since the business did not have the money to pay Michael Flutie's salary, the business paid Michael's personal expenses. The rationale was that some day Flutie N.Y. would be able to pay Michael such a salary and he would reimburse Flutie N.Y. for the personal expenses. [Trial Trans. at 265–66 (Day 2) ]. Despite this arrangement, for five straight years Michael Flutie never received such a salary and never reimbursed Flutie N.Y. for his expenses. [Trial Trans. at 266 (Day 2) ].

73. Although Flutie N.Y.'s company policy regarding reimbursement of American Express expenses required the person holding the card to turn in receipts and an expense report, the policy was not always followed. [Trustee Trial Ex. 119; Trial Trans. at 45 (Day 1)]. No expense reports were ever provided by Flutie N.Y. for Michael Flutie or Albert Flutie.

*Michael Flutie's Use of Flutie N.Y. Assets for Albert Flutie*

74. Albert Flutie, although the nominal owner and President of Flutie N.Y., was merely a figurehead and had no control of Flutie N.Y. Albert Flutie never made any substantive decisions with respect to the direction of the company, its finances, or anything else. [Trial Trans. at 157 (Day 1); Trial Trans. at 93 (Day 2)].

75. However, Michael Flutie took actions to benefit his father, Albert Flutie, at the expense of the Debtor. Michael arranged for Flutie N.Y. to pay Albert Flutie a salary. [Trial Trans. at 230 (Day 1)]. According to Albert Flutie's tax returns he earned $40,228 in 1998, $72,965 in 1999, and $19,500 in 2000 as income from Flutie N.Y. while performing no services for Flutie N.Y. No tax returns were provided for 2001. [Trustee Trial Exs. 8–9, 121].

76. In addition, Michael Flutie used the assets of Flutie N.Y. to pay Albert Flutie's car lease payments, even though the car was not used for business purposes. In 1999, Flutie N.Y. paid at least $878 for Albert Flutie's car and in 2000 paid $5,419, and in 2001 at least $1,842 was paid. [Trustee Trial Exs. 2–4].

*Flutie Entertainment*

77. Flutie Entertainment was an entity controlled and dominated by Michael Flutie and his younger brother, Robert Flutie. Flutie Entertainment operated out of Flutie N.Y.'s offices located at 270 Lafayette Street, Suite 1400 and then later at Victoria Suns' office located at 17 Little West 12th Street, New York, New York and it is unclear from the evidence submitted whether Flutie Entertainment ever paid rent at either of those locations. [Trial Trans. at 38 (Day 1); Trial Trans. at 146, 164–165 (Day 2)].

78. Robert Flutie worked for Flutie N.Y. between 1992 and 1995, left for a one year period and returned to Flutie N.Y. to take over Flutie Entertainment in 1996. [Trial Trans. at 54–55, 139–141 (Day 2)].

79. According to his own testimony, while working at Flutie N.Y., Robert Flutie worked toward building the Flutie name into a company that could perform fashion and advertising services for models, do their public relations, their press, arrange media opportunities and ultimately launch their television and/or film career. His plan was to create a "one stop shop for beautiful people" and was something he worked on while at Flutie N.Y. between 1992 and 1995. [Trial Trans. at 143–144 (Day 2)].

80. According to his own testimony, Robert Flutie traveled all over the world attempting to brand the name "Company Management" and Flutie Entertainment. This endeavor was paid for by Flutie N.Y. [Trial Trans. at 144–145 (Day 2)]. Upon Robert Flutie's return to Flutie N.Y. in 1996, he focused on Flutie Entertainment and took over the Flutie Entertainment business. [Trial Trans. at 54–55, 141 (Day 2)].

81. Through Flutie Entertainment, he sought to extend the life cycle of the models which were brought in through Flutie N.Y. and Michael's connections as a personal manager in the industry. [Trial Trans. at 144 (Day 2)].

82. Flutie Entertainment developed film and television projects and advised and managed actors and actresses. [Trial

48

Trans. at 139–142 (Day 2)]. Flutie Entertainment submitted models who were under contract to work for Flutie N.Y. for auditions for parts in movies and television. [Trial Trans. at 39 (Day 1)]. According to Robert Flutie, successful development of the models into movies and television took at least three to five years, and he began the process either in the 1992 to 1995 time frame, or in 1996 when he returned to the company. [Trial Trans. at 146–50 (Day 2)].

83. Not only did Flutie N.Y. and Flutie Entertainment share the same models, but they did so pursuant to Flutie N.Y.'s contracts with them. The models did not have separate contracts with Flutie Entertainment and any fee earned by Flutie Entertainment was not shared with Flutie N.Y. [Trial Trans. at 39–40 (Day 1)].

84. Flutie Entertainment came to represent, among others, Jaime King and Alexis Bledel, both of whom were "discovered" by Michael Flutie and were clients of Flutie N.Y. [Trial Trans. at 157, 160].

85. Various published articles illustrate the interconnected relationship between Michael Flutie, Flutie N.Y. and Flutie Entertainment. For example, Michael Flutie has been quoted as saying "After 22 years in the fashion industry, I've decided to merge my resources and move into building brand names in the film and television world.... Flutie has now created a separate company ... called Flutie Entertainment." [Trustee Trial Ex. 122].

86. Michael Flutie testified that "the only thing we did at Flutie Entertainment really is sort of take the assets of Company Management and look within our organization to see who had potential and go on to develop them." [Trial Trans. at 245–246 (Day 1); Trustee Trial Ex. 82].

87. Flutie N.Y. paid all of the operating expenses for the office space located at 270 Lafayette Street, including the space occupied by Flutie Entertainment. Moreover, Flutie N.Y. advanced monies to Flutie Entertainment at least up until the end of 1999 so that it could operate. [Trial Trans. at 260 (Day 2)].

88. According to the Debtor's books and records, and confirmed by Robert Mayer, Flutie Entertainment owed at least $191,089 to Flutie N.Y. [Trial Trans. at 261 (Day 2); Trustee Trial Ex. 119]. There are no records to show that Flutie Entertainment reimbursed Flutie N.Y. for those payments. [Trustee Trial Ex. 2].

89. In February 1999, Robert Mayer discussed with Michael Flutie that it was necessary to "cut off" the money that was being spent on Flutie Entertainment. [Trial Trans. at 261 (Day 2)]. Eventually, in October of 1999, Robert Mayer sent a memo to Michael and Robert Flutie informing them that no more advances should be made from Flutie N.Y. to Flutie Bros. or to Flutie Entertainment. [Trustee Trial Ex. 31].

90. In or around February 1999, Robert Mayer, Flutie's accountant, advised Michael Flutie and Robert Flutie to shut down Flutie Entertainment Corp. because it was not generating sufficient revenues to continue its business. [Trial Trans. at 152–153 (Day 2)].

91. Robert Mayer advised Robert Flutie that he must create a different corporate entity if he wanted to continue running the Flutie Entertainment business. [Trial Trans. at 154–155 (Day 2)]. As a result of Mayer's advice, in November, 1999, Robert Flutie created Flutie Bros. LLC d/b/a Flutie Entertainment ("Flutie Bros."). In 1999, Flutie Bros. proceeded to take over the business of Flutie Entertainment. No consideration was paid for the transfer of that business [Trial Trans. at 152, 169–170, 172, 205, 218 (Day 2)].

92. Flutie Bros. continued to use the Flutie Entertainment space, which was part of the Flutie N.Y. offices located at 270 Lafayette Street, [Trial Trans. at 209 (Day 2)] and shared Flutie N.Y.'s office equipment, vendor accounts, insurance policies and employees. [Trial Trans. at 209 (Day 2)]. Flutie N.Y. carried Flutie Bros. employees on Flutie N.Y.'s health and dental plans. [Trustee Trial Exs. 3–4].

93. At the end of 2002, Robert Flutie was advised that he needed to change the corporate structure of Flutie Bros. to a subchapter S corporation. Thereafter, Flutie Entertainment USA, Inc. was formed and a statutory merger occurred with Flutie Entertainment USA, Inc. acquiring Flutie Bros. No consideration was paid for this transfer. [Trial Flutie Trans. at 170–171 (Day 2)].

94. Robert Flutie testified at trial that he is a consultant and performs services for various entities primarily owned by his wife, Maryann Flutie, including Flutie Holding Corp. [Trial Trans. at 134–135 (Day 2)]. Despite claiming that Maryann Flutie is actively involved in Flutie Bros., Flutie Entertainment, Flutie Entertainment USA, Inc. and Fit, Inc., no evidence of any such involvement was presented. When asked to identify and describe the roles of the employees of Flutie Entertainment, Robert Flutie pointedly omitted his wife. [Trial Trans. at 167 (Day 2)]. According to his tax returns, Robert Flutie's *declared income was $3,146 in 1999, $5,470 in 2000, and $1,753 in 2001.* [Trustee Trial Exs. 14–16]. Sums that are substantially below the poverty line.

95. Robert Flutie testified that Michael Flutie has no connection with Flutie Entertainment. However, Michael Flutie has made it known that he is the Flutie of "Flutie Entertainment" and Robert admittedly has not done anything to stop Michael Flutie from referring to himself as "Michael Flutie of Flutie Entertainment." [Trial Trans. at 227].

96. In fact, Kristine Szabo testified at trial that she was under the impression that Michael Flutie started Flutie Entertainment and was the President. Ms. Szabo also testified that it was her understanding that Michael is actively trying to find television and other entertainment-type jobs for her. [Trial Trans. at 75–76 (Day 1)].

97. Flutie Entertainment and Flutie N.Y. represent the same women, including Jaime King and Alexis Bledel. [Trial Trans. at 156–159 (Day 2)]. Although, Robert testified at trial that he was not aware that Alexis Bledel had ever done any modeling for Flutie N.Y., he was introduced to Ms. Bledel in the offices he shared with Flutie N.Y. at 270 Lafayette Street. [Trial Trans. at 159–160 (Day 2)].

98. Alexis Bledel performed modeling work for CRK Advertising in 1999 earning commissions for Flutie N.Y. and acted on a television show, namely the Gilmore Girls, of which she earns commissions for Flutie Entertainment. [Trustee Trial Ex. 91; Trial Trans. at 161]. Moreover, despite the fact that Robert Flutie professed to have no knowledge that Alexis Bledel had ever worked for Michael Flutie or Flutie N.Y, Robert did not deny the accuracy of Bledel's internet listing which refers to Michael Flutie as Ms. Bledel's agent and further states that "Alexis was introduced to her manager, Michael Flutie of Flutie Entertainment and Company Management." [Trustee Trial Ex. 93; Trial Trans. at 223–26 (Day 2)].

99. Finally, Jaime King works for Revlon under a contract that Michael Flutie arranged, under which he receives a 5% to 9% commission based on a sliding scale of income. [Trial Trans. at 63 (Day 2)]. However, the Revlon contract requires

that the checks be made out to Flutie Entertainment. [Trial Trans. at 186 (Day 2) ]. Jaime King is also represented by Robert Flutie. Robert Flutie and Flutie Entertainment receive commissions for work that she does related to television or film. [Trial Trans. at 158, 213].

### Issues of Credibility

100. Before the lunch recess, when Marion Smith was first called to testify concerning the model contracts and the high percentage of models under contract at Flutie N.Y., she testified in a thoughtful, assured and seemingly forthright manner. I credit this portion of her testimony. After taking a recess for lunch, however, the manner of Marion Smith's later testimony was altogether different from her testimony before lunch. She appeared very nervous and defensive. Her answers were suddenly much more supportive of Michael Flutie's case than they had been previously. These observations, together with the fact that Marion Smith had lunched with Michael Flutie (and, presumably, his lawyer) [Trial Trans. at 268–69 (Day 1) ], tend to taint the credibility of her later testimony. Consequently, I give less weight to her later testimony.

101. Kristine Szabo, a model with Flutie N.Y. and the other variations of Company Management, was frank and outspoken. I found her testimony credible.

102. In finding that Flutie N.Y. was insolvent from at least 1995 to 2001 and that Flutie N.Y. was undercapitalized almost from its inception, I have considered the testimony of the Trustee's expert Jeffrey Katz, Mr. Katz' report, the few financial documents made available by Flutie N.Y. to the Trustee, as well as documentation found through the Trustee's investigative efforts. I find Mr. Katz to be a highly qualified and experienced forensic accountant. He testified in a straightforward and intelligent manner and exhibited a thorough knowledge of the financial situation of Flutie N.Y., as based upon available documentation. I credit his testimony.

103. More often than not, I found the testimony of Michael Flutie to be evasive, lacking in credibility, or both. When asked about the continuum of Company Management, Michael Flutie was extremely evasive. [Trial Trans. at 145–49 (Day 1) ]. His testimony that he did no work for models in 1999 and 2000 is in direct conflict with the testimony of Kristine Szabo. When confronted with this conflict, he ultimately admitted that he had indeed negotiated the renewal of Ms. Szabo's contract with Nivea [Trial Trans. at 159–60 (Day 1) ]. He also attempted to evade the Trustee's questions that were meant to show that Michael Flutie was the principal behind Flutie N.Y. Again, he ultimately confessed that he was indeed the decision maker for Flutie N.Y. [Trial Trans. at 150–57, 161–62 (Day 1) ]. The rest of Michael Flutie's testimony is similarly laced with such examples of evasion and denial—repeatedly, Michael Flutie eventually succumbed and admitted the falsity of his testimony when confronted with conflicting evidence and/or testimony. Therefore, I find the testimony of Michael Flutie greatly lacking in credibility.

104. From beginning to end, the testimony of Robert Flutie was evasive and unreliable. Robert Flutie consistently refused to give forthright answers in response to the Trustee's questions. Even very simple questions, such as "what do you do?" were met with the Three Card Monte-type tactics [5] employed by Robert

---

5. Three Card Monte is a shell or scam street card game calculated to foil the efforts to find the hidden true card. *See* Whit Haydn, Whit Haydn and Chef Anton present the School for Scoundrels notes on three-card monte (Alta Loma, CA, The School for Scoundrels 2001).

Flutie throughout his testimony. [Trial Trans. at 133–41 (Day 2)]. I find his testimony to be wholly without credibility.

105. Robert Mayer, Michael Flutie's accountant and financial advisor, also testified at trial. When questioned about specific entries or specific checks, he answered fairly consistently that he did not know what specific checks were for or why certain entries had been made. [Trial Trans. at 254–55 (Day 2)]. Although called as a witness for the Defendants, he presented no financial evidence, or any other evidence for that matter, that would rebut an inference of Flutie N.Y.'s insolvency. During his testimony, he contended that Flutie N.Y.'s policy of paying Michael Flutie's expenses in lieu of a salary did not amount to tax fraud because Michael Flutie "intended to take his compensation at a later date." However, this policy continued unabated for four or five years. [Trial Trans. at 266 (Day 2)]. Based upon his role as an advisor, his professed general lack of knowledge of the specific activities of Flutie N.Y., his lack of disinterestedness, as well as his questionable and perhaps subjective understanding (for an accountant) of what may or may not constitute tax fraud [Trial Trans. at 265–66 (Day 2)], I have given less weight to his testimony.

### CONCLUSIONS OF LAW

#### Jurisdiction and Venue

1. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 and § 1334.

2. This matter is a core proceeding under 28 U.S.C. § 157 and is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

3. Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409.

#### Fraudulent Transfers Against All of the Defendants

##### (i) Pursuant to 11 U.S.C. § 548 and 11 U.S.C § 550

4. To establish a claim for a fraudulent transfer pursuant to section 548 of the Bankruptcy Code, the Trustee must establish that (1) the debtor had an interest in property; (2) a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the debtor received less than a reasonably equivalent value in exchange for such transfer. BFP v. Resolution Trust Corp., 511 U.S. 531, 535, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

5. Bankruptcy Code section 101(32) defines "insolvent" as a "financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property, at a fair valuation ..." The Trustee has submitted a copy of Flutie N.Y.'s corporate tax returns for the relevant time period that show negative retained earnings, negative stockholder equity and substantial income losses in five out of the six years. The Trustee's expert, while not expressing an opinion about the solvency of Flutie N.Y. at any one point in time, did state that from at least December 1997 through December 2000 (the only time period for which financial documents were provided), Flutie N.Y.'s liabilities exceeded its assets. Further, based on the documents provided by the Defendants, the Trustee's expert concludes that from the beginning of the corporation, Flutie N.Y. was undercapitalized. The Defendants contend that the Trustee cannot establish Flutie N.Y.'s insolvency or undercapitalization based upon financial statements, because financial statements

do not ordinarily reflect the fair salable value of assets.

6. However, it is well within the discretion of the Bankruptcy Court to determine whether evidence presented to the Court is sufficient to support a finding of insolvency. *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 35 (2d Cir.1996). Furthermore, while an asset's book value may not generally be the appropriate measure of its fair value, such figures may still support a court's inference of an entity's insolvency in some circumstances. *Id.* at 36 (citing *Schlant v. Schueler (In re Buffalo Auto Glass)*, 187 B.R. 451 (Bankr.W.D.N.Y.1995)). In *In re Buffalo Auto Glass*, the Court inferred a debtor's insolvency from its corporate tax returns. The trustee presented the Court with copies of the debtor's tax returns, which showed negative retained earnings for the pertinent time period. The Court found that the trustee had established the debtor's insolvency by a preponderance of the evidence, because the debtor had failed to produce any evidence that the tax returns did not establish its insolvency. *Id.* at 453.

7. Similarly, the tax returns of Flutie N.Y. also show negative retained earnings for the years 1995 through 2001. Although the Defendants have tried to refute an inference of insolvency with the argument that the fair value of the model contracts was never investigated, the Defendants have failed to present any evidence that the tax returns should not be relied upon for a finding that Flutie N.Y.'s liabilities outweighed its assets or that it was indeed insolvent. Moreover, the Defendants' accountant, Robert Mayer, did not offer any credible evidence about the financial condition of Flutie N.Y. that would rebut the inference of insolvency. Based upon the preponderance of the evidence offered at trial, testimonial and documen-

tary, this Court can and does find that the insolvency of Flutie N.Y. has been established from 1997 through the Petition Date.

8. Here, model management contracts and/or its arrangements for the services of the models it represented were transferred out of the estate within one year before the Debtor filed for bankruptcy. At the time these transfers took place, Flutie N.Y. was either insolvent or became insolvent as a result of the transfers. Flutie N.Y. received no value in exchange for these transfers. These transfers constitute fraudulent transfers as to all of Debtor's creditors. Because the Defendants failed to provide any records or accounting of such transfers, they are directed to give an accounting and turn over to the Trustee all monies received, and all future monies, on account of all the models at Flutie N.Y. as of April 2001 to the present. This includes models that were at Flutie N.Y. that may now be managed by Flutie Media or Victoria Suns.

### (ii) Pursuant to New York Debtor and Creditor Law § 273

9. To establish a claim pursuant to New York Debtor Creditor Law § 273, made applicable by section 544(b) of the Bankruptcy Code, the Trustee must show that Debtor (1) conveyed the property to the transferee; (2) without fair consideration; and (3) thereby was rendered insolvent. *Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152, 159 (Bankr.E.D.N.Y. 2000). Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration. Under New York law, where the transaction involves family members and the transaction was made without any

tangible consideration, a heavier burden is placed upon the grantee to demonstrate fair consideration. *U.S. v. McCombs*, 30 F.3d 310, 323 (2d Cir.1994).

10. Fair consideration is given for property, or ·obligation (1) when in exchange for such property, or obligation, as a fair equivalent therefore, and in good faith, property is conveyed or an antecedent debt is satisfied, or (2) when such property, or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property, or obligation obtained. N.Y. DEBTOR & CREDITOR LAW § 272 (McKinney 2001).

■ 11. Flutie N.Y. transferred model management contracts and/or its arrangements for the services of the models it represented to Flutie Media and other entities owned or controlled by Michael Flutie or other members of his family. Flutie N.Y. also transferred corporate money, in the form of sizeable loans and personal payments, to or for the benefit of Michael Flutie, Albert Flutie and to other entities controlled by them. The Debtor received no consideration for such transfers.

12. Michael and Albert Flutie argue that the loans were in lieu of a salary for Michael and, therefore, the Debtor did receive consideration in the form of Michael Flutie's services. Michael and Albert Flutie rely upon *Ravens Metal Products, Inc. v. McGann*, 267 A.D.2d 527, 699 N.Y.S.2d 503 (N.Y.1999). In *Ravens*, the Court found that a fraudulent transfer did not occur where the principal withdrew corporate monies to pay her personal expenses and obligations. The *Ravens* Court held that because the plaintiff had not shown that the monies withdrawn were in excess of what would be fair consideration for the principal's services, the plaintiff had failed to prove that the transfers occurred without consideration. *Id.* at 529, 699 N.Y.S.2d 503.

13. The facts are very different here. Michael Flutie's accountant testified that Michael was to receive a yearly salary of around $100,000. Although Michael Flutie argues that his loans[6] and wages[7] for the years 1999 through 2001 average only $107,000, this amount does not take into account the Flutie N.Y. American Express charges by Michael of around $240,000 a year. Some of the American Express charges may indeed have been for legitimate expenses, but Michael Flutie has utterly failed to present any credible evidence that these charges were anything other than Michael Flutie's use of the Flutie N.Y. corporate form to enjoy a standard of living that he could not personally afford—ultimately, Flutie N.Y. could not afford it either. I find that the Trustee has indeed carried his burden of proof and has shown that Michael Flutie caused Flutie N.Y. to make fraudulent conveyances for his personal benefit without fair consideration therefor.

■ 14. As already noted above, Flutie N.Y was insolvent on the dates that these loans and payments were transferred and/or became insolvent as a result of these transfers. Indeed, Flutie N.Y. was undercapitalized from its inception, and

---

6. No documentation of these loans, beyond entries in Flutie N.Y.'s general ledger, was ever produced to the Trustee or to this Court. Moreover, this Court has serious concerns about the apparent use of "loans" in lieu of salary as a possible means of committing tax evasion. Flutie N.Y. was allegedly unable to pay Michael Flutie a salary of $100,000 for five years, yet incredibly was able to "loan" him substantially greater sums during the same period.

7. Including payments to Albert Flutie.

suffered substantial losses in five of the six years for which records were provided. [Trustee Trial Ex. 119, p. 12]. Moreover, where a transfer occurs without consideration, the defendant is presumed to have been insolvent at the time of the transfer and may only rebut the presumption by proving its continued solvency after the date of the transfer. *RTC Mortg. Trust 1995–S/N1 v. Sopher*, 171 F.Supp.2d 192, 199 (S.D.N.Y.2001). The Defendants have not presented any evidence to rebut the presumption of Flutie N.Y.'s insolvency.

15. Flutie N.Y. has been damaged as a result of these transfers, and other transfers including, but not limited to payment of rent, utilities, personal American Express charges, personal loans, and car leases and the acts and omissions of Michael Flutie and Albert Flutie. Flutie N.Y. was stripped of valuable assets without consideration and lost substantial commissions it would have otherwise earned under its modeling contracts.

16. Accordingly, the Court directs the Defendants give an accounting of and to turn over to the Trustee all monies received, and all future monies, on account of all the models at Flutie N.Y. as of April 2001 to the present. This includes models that were at Flutie N.Y. that may now be managed by Flutie Media or Victoria Suns.

*(iii) Pursuant to New York Debtor and Creditor Law § 274*

17. To establish a claim pursuant to New York Debtor and Creditor Law § 274, the Trustee must show that (1) the property of the debtor has been fraudulently conveyed; (2) that the conveyance was made without fair consideration; and (3) that the conveyance was made by a person engaged in, or about to be engaged in a business or transaction for which the property remaining after the transaction is an unreasonably small capital. *California*

*Airparts Corp. v. Rubino*, 21 Misc.2d 490, 192 N.Y.S.2d 180, 184 (1959).

18. Flutie N.Y. transferred its model management contracts and/or its arrangements for the services of the models it represented to Flutie Media and other entities controlled by Michael Flutie and his family members. Flutie N.Y. transferred corporate money, in the form of sizeable loans and personal payments to or for the benefit of Michael Flutie, Albert Flutie and to other entities controlled by them, including approximately $191,089 in loans to Flutie Entertainment. These transfers were made at a time when Flutie N.Y. was engaged in a business for which the property remaining in its hands after the transfers constituted unreasonably small capital. [Trustee Trial Ex. 112, p. 12]. Flutie N.Y. received less than fair consideration for these conveyances, which constitute fraudulent conveyances as to then present creditors, and as to other persons who became creditors during the continuance of the business.

19. Flutie Bros, and its successor Entertainment USA, contend that they are not liable for the loans made by Flutie N.Y. to Flutie Entertainment. To be held liable they would have to be the successors of Flutie Entertainment. To prove this, the Trustee must show that (1) Flutie Bros expressly or impliedly assumed the liabilities of Flutie Entertainment; (2) the transaction amounted to a de facto consolidation or merger of the seller and purchaser; (3) the purchaser was a mere continuation of the seller; or (4) the transaction was entered into fraudulently for the purpose of escaping such liability. *Kern v. Frye Copysystems, Inc.*, 878 F.Supp. 660, 664 (S.D.N.Y.1995).

20. Here, the facts are abundantly clear that Flutie Bros was little more than a continuation of Flutie Entertain-

ment. Flutie Bros continued to conduct business under the name "Flutie Entertainment." Flutie Bros was also controlled and run by Robert Flutie, as Flutie Entertainment had been before it was dissolved. Flutie Bros performed essentially the same business function as Flutie Entertainment had before it was dissolved. Furthermore, a substantial amount of the talent represented by Flutie Entertainment was later represented by Flutie Bros doing business as "Flutie Entertainment." *See Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 244, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983)(mere continuation "refers to corporate reorganization ... where only one corporation survives the transaction; the predecessor must be extinguished."); *see also Parra v. Production Machine Co.,* 611 F.Supp. 221, 223–24 (E.D.N.Y.1985)(mere continuation "envisions a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer."). Sufficient evidence is also present to show that Flutie Entertainment was shut down to allow Robert Flutie to take over the brand "Flutie Entertainment" for use by his new company Flutie Bros without assuming the liabilities—including the $191,089 owed to Flutie N.Y. Therefore, I find that sufficient evidence exists on the record to show that Flutie Bros, and Flutie Bros' successor, Entertainment USA, are successors to Flutie Entertainment and are therefore liable for Flutie Entertainment's debt to Flutie N.Y.

21. The Trustee is entitled to recover from the transferees the value of the conveyances.

22. Because the Defendants failed to provide any records or accounting of such transfers, they are directed to give an accounting of and turn over to the Trustee all monies received, and all future monies, on account of all the models at Flutie N.Y.

as of April 2001. In addition, the Court finds the Defendants liable for the following: Michael Flutie for $1,184,086 in outstanding loans ($220,247 in 1998, $273,794 in 1999, $386,251 in 2000, and $303,794 in 2001) [Trustee Trial Exs. 2–4, 119, p. 6], $97,459 for reimbursement of rent, utilities and auto expenses [Trustee Trial Ex. 119, p. 7], and $407,353 for reimbursement of personal expenses on his American Express card [Trustee Trial Ex. 119, p. 7]; Albert Flutie for $132,693 in alleged salary [Trustee Trial Ex. 119, p. 8], and $8,139 in automobile expenses [Trustee Trial Ex. 119, p. 8]; Flutie Media for $186,816 in loans [Trustee Trial Ex. 119, p. 10]; and, as the successors to Flutie Entertainment, Flutie Bros and Entertainment USA, Inc. for $191,089 in loans [Trustee Trial Ex. 119, p. 10].

### (iv) Pursuant to New York Debtor and Creditor Law § 275

23. To satisfy a claim of fraudulent conveyance under section 275 of the New York Debtor and Creditor law, the Trustee must establish that (1) the conveyance was made without fair consideration; and (2) that it will thereby render the conveying party insolvent or that the property remaining after the conveyance is insufficient to pay the conveying party's probable liabilities on existing debts as they become mature. *Fromer v. Yogel,* 50 F.Supp.2d 227, 246 (S.D.N.Y.1999).

24. Flutie N.Y. transferred its model management contracts and/or its arrangements for the services of the models it represented to Flutie Media and other entities controlled by Michael Flutie and his family members. Flutie N.Y. transferred corporate money, in the form of sizeable loans and personal payments to or for the benefit of Michael Flutie, Albert Flutie and to other entities controlled by them. These transfers were made at a

time when the Debtor knew that it would incur debts at beyond its ability to pay as such debts matured. These transfers were made without fair consideration and constitute fraudulent conveyances as to both then present and future creditors.

25. Because the Defendants failed to provide any records or accounting of such transfers, they are directed to give an accounting of and turn over to the Trustee all monies received, and all future monies, on account of all the models at Flutie N.Y. as of April 2001. In addition, the Court finds the Defendants liable for the following: Michael Flutie for $1,184,086 in outstanding loans ($220,247 in 1998, $273,794 in 1999, $386,251 in 2000, and $303,794 in 2001) [Trustee Trial Exs. 2–4, 119, p. 6], $97,459 for reimbursement of rent, utilities and auto expenses [Trustee Trial Ex. 119, p. 7], and $407,353 for reimbursement of personal expenses on his American Express card [Trustee Trial Ex. 119, p. 7]; Albert Flutie for $132,693 in alleged salary [Trustee Trial Ex. 119, p. 8], and $8,139 in automobile expenses [Trustee Trial Ex. 119, p. 8]; Flutie Media for $186,816 in loans [Trustee Trial Ex. 119, p. 10]; and, as the successors to Flutie Entertainment, Flutie Bros and Entertainment USA, Inc. for $191,089 in loans [Trustee Trial Ex. 119, p. 10].

### (v) Pursuant to New York Debtor and Creditor Law § 276

26. Every conveyance made and every obligation incurred with actual intent, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditor. To prevail on a claim under section 276 of the New York Debtor and Creditor law, the Trustee must establish that (1) the thing transferred has value out of which the creditor could have realized a portion of its claim; (2) that this thing was transferred or disposed of by debtor; and (3) that the transfer was done with actual intent to defraud. *Gentry v. Kovler (In re Kovler),* 249 B.R. 238, 243 (Bankr.S.D.N.Y.2000).

27. The relevant intent may be inferred from the facts and circumstances surrounding the transfer. *Cadle Co. v. Newhouse,* 2002 WL 1888716, at *6 (S.D.N.Y. Aug. 16, 2002) (citing *U.S. v. Carlin,* 948 F.Supp. 271, 277 (S.D.N.Y 1996)). Such facts and circumstances, which may be considered "badges of fraud," include: (1) lack or inadequacy of consideration; (2) family, friendship or close associate relationship between the parties; (3) retention of possession, benefit, or use of the property in question; (4) financial condition of the party sought to be charged both before and after the transaction in question; (5) existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties or pendency or threat of suits by creditors; and (6) general chronology of the events and transactions under inquiry. *Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582–83 (2d Cir.1983). Almost all of the badges are abundantly visible in this case.

28. Flutie N.Y. transferred its model management contracts and/or its arrangements for the services of the models it represented to Flutie Media and other entities controlled by Michael Flutie with actual intent to hinder, delay or defraud either present or future creditors and for no consideration. Flutie N.Y. transferred corporate money, in the form of sizeable loans and personal payments to or for the benefit of Michael Flutie, Albert Flutie and to other entities controlled by them. These transfers were made at a time when the Debtor knew that it would incur debts beyond its ability to pay as such debts matured. These transfers were made

without fair consideration and constitute fraudulent conveyances as to both (then) present and future creditors. These conveyances are hereby avoided and the Trustee is entitled to set aside and recover from transferees the value of the conveyances.

29. Because the Defendants failed to ⋅ provide any records or accounting of such transfers, they are directed to give an accounting of and turn over to the Trustee all monies received, and all future monies, on account of all the models at Flutie N.Y. as of April 2001. In addition, the Court finds the Defendants liable for the following: Michael Flutie for $1,184,086 in outstanding loans ($220,247 in 1998, $273,794 in 1999, $386,251 in 2000, and $303,794 in 2001) [Trustee Trial Exs. 2–4, 119, p. 6], $97,459 for reimbursement of rent, utilities and auto expenses [Trustee Trial Ex. 119, p. 7], and $407,353 for reimbursement of personal expenses on his American Express card [Trustee Trial Ex. 119, p. 7]; Albert Flutie for $132,693 in alleged salary [Trustee Trial Ex. 119, p. 8], and $8,139 in automobile expenses [Trustee Trial Ex. 119, p. 8]; Flutie Media for $186,816 in loans [Trustee Trial Ex. 119, p. 10]; and, as the successors to Flutie Entertainment, Flutie Bros and Entertainment USA, Inc. for $191,089 in loans [Trustee Trial Ex. 119, p. 10].

### Breach of Fiduciary Duty

30. To satisfy a claim for breach of fiduciary duty, plaintiff must prove (1) the existence of a fiduciary relationship between the parties and (2) breach of the fiduciary duty. *Cramer v. Devon Group, Inc.*, 774 F.Supp. 176, 184 (S.D.N.Y.1991). A court will find that breach of fiduciary duty is properly alleged when the Debtor was insolvent or rendered insolvent by a fraudulent transfer or was operating in the vicinity of insolvency at the time of or immediately after the transfer. *Official*

*Committee of Asbestos Claimants of G–I Holding, Inc. v. Heyman*, 277 B.R. 20 (S.D.N.Y.2002).

31. Michael Flutie, as the dominant and controlling personage, and in the absence of a formal operating board of directors, assumed a fiduciary obligation as the de facto president of Flutie N.Y. and then abused this position. To satisfy his fiduciary obligations, Michael Flutie's actions should be fair and in the best interest of the corporation. Here, Michael Flutie withdrew significant assets out of Flutie N.Y. under the guise of loans and then used those funds to set up and operate Flutie Media and Flutie Entertainment.

32. To satisfy a claim for knowing participation in a breach of fiduciary duty, the Trustee must satisfy three elements: (1) a breach by the fiduciary of obligations owed to another; (2) that the defendant knowingly induced or participated in the breach; and (3) that the plaintiff suffered damages. *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847–848 (2d Cir. 1987).

33. Michael Flutie, much as a director of a corporation that is in the zone or vicinity of insolvency, owes a fiduciary duty not only to Flutie N.Y. and any shareholders, but also to its creditors. *See Pereira v. Cogan*, 294 B.R. 449 (S.D.N.Y.2003)(director of corporation in zone of insolvency no longer just liable to shareholders, but to creditors as well); *see also Management Technologies, Inc. v. Morris*, 961 F.Supp. 640, 645–46 (S.D.N.Y.1997)(citing *Credit Lyonnais Bank Nederland, N.V. v. Pathe Comm. Corp.*, 1991 WL 277613 (Del.Ch.1991)).

34. Here, the Trustee has established an elongated zone of insolvency encompassing the transactions at issue. Flutie N.Y. was almost never maintained as a solvent going concern given the enormous

drain on cash flow to satisfy the personal life style of the principle, Michael Flutie. This is a classic case of a principal using the enterprise as a personal piggy bank while putatively avoiding a declaration of personal income. The Trustee's forensic accountant's financial evaluation was unrebutted by the Defendants. Defendants' accountant presented no probative evidence to rebut the issue of Flutie N.Y.'s insolvency and/or undercapitalization.

35. Michael Flutie, as the controlling and dominant figure in the operation of Flutie N.Y., notwithstanding the figurehead position of his father as president, breached his fiduciary duties to Flutie N.Y. when he permitted and actively orchestrated the transfer of assets from Flutie N.Y. Michael Flutie stripped the assets of the Debtor, with the concurrence of his father. Debtor's estate has been rendered insolvent, as a direct result of the looting, domination and control of the Debtor by Michael Flutie and his fraudulent transfers of the Debtors assets to himself, to members of his immediate family, to other persons or corporations controlled or dominated by Michael Flutie.

36. Albert Flutie is also liable for damages for breach of fiduciary duty. Albert Flutie was the president and 100% shareholder of Flutie N.Y. and had an obligation to perform his duties with good faith and loyalty. Albert Flutie knew or should have been aware of Michael Flutie's breach of his fiduciary duties. A defendant may be charged with constructive knowledge of the primary violator's breach if he is on notice of conduct which may constitute a breach and fails to undertake a reasonable investigation. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 283 (2d Cir.1992); *see also American Republic Insurance Co. v. Union Fidelity Life Insurance Co.,* 470 F.2d 820, 824–26 (9th Cir.1972) (third party who knew or should have known of breach of duty cannot "remain silent and accept benefits derived from the activities of" the disloyal employee).

37. Because the Defendants failed to provide any records or accounting of such transfers, they are directed to give an accounting of and turn over to the Trustee all monies received, and all future monies, on account of all the models at Flutie N.Y. as of April 2001. In addition, the Court finds the Defendants liable for the following: Michael Flutie for $1,184,086 in outstanding loans ($220,247 in 1998, $273,794 in 1999, $386,251 in 2000, and $303,794 in 2001) [Trustee Trial Exs. 2–4, 119, p. 6], $97,459 for reimbursement of rent, utilities and auto expenses [Trustee Trial Ex. 119, p. 7], and $407,353 for reimbursement of personal expenses on his American Express card [Trustee Trial Ex. 119, p. 7]; Albert Flutie for $132,693 in alleged salary [Trustee Trial Ex. 119, p. 8], and $8,139 in automobile expenses [Trustee Trial Ex. 119, p. 8]; Flutie Media for $186,816 in loans [Trustee Trial Ex. 119, p. 10]; and, as the successors to Flutie Entertainment, Flutie Bros and Entertainment USA, Inc. for $191,089 in loans [Trustee Trial Ex. 119, p. 10]. In addition, Michael and Albert Flutie are personally liable for the debts of the Estate.

### Unjust Enrichment

38. Under the controlling law of the State of New York, to satisfy a claim for unjust enrichment, the Trustee must establish three elements, that (1) defendant was enriched; (2) enrichment was at the plaintiff's expense; and (3) defendant's retention of the benefit would be unjust. *Hutton v. Klabal,* 726 F.Supp. 67, 72 (S.D.N.Y.1989). Here, Michael Flutie has benefitted significantly from the exploitation of Flutie N.Y.'s valuable stable of models under contract. He has benefitted from the receipt of personal loans from

Flutie N.Y. in the amount of $1,184,086 ($220,247 in 1998, $273,794 in 1999, $386,251 in 2000, and $303,794 in 2001) [Trustee Trial Exs. 2–4, 119, p. 6], the payment of his rent, auto expenses and utility bills by Flutie N.Y. in the amount of $97,459 [Trustee Trial Ex. 119, p. 7] and the use of the corporate American express card for payment of personal, non-business expenses in the amount of $407,353 [Trustee Trial Ex. 119, p. 7] for a total of $1,688,898. Retention of such benefits violates the fundamental principles of justice, equity and good conscience. Accordingly, the Trustee is entitled to recover the sum of $1,688,898 from Michael Flutie on the claim of unjust enrichment.

### Tortious Interference with Contract

39. Under New York law, the elements of a claim for tortious interference with contract are: (1) the existence of a valid contract between a third party and the plaintiff; (2) that defendant had knowledge of that contract; (3) that defendant intentionally procured a breach; and (4) damages were incurred. *Riddell Sports Inc. v. Brooks*, 872 F.Supp. 73, 77 (S.D.N.Y.1995) (holding that a reasonable trier of fact could conclude that one or more officers and directors induced contractual breaches using improper means or motivated by malice and denying motion to dismiss). Plaintiff need only show there was a valid and enforceable contract and that the underlying contract has been breached and that the breach was as a result of the actions of the defendants. *Special Event Entertainment v. Rockefeller Center, Inc.*, 458 F.Supp. 72, 78 (S.D.N.Y.1978).

40. Here, according to the untainted portion of Marion Smith's testimony, Flutie N.Y. had valid, binding contracts with the majority of its models, of which Michael Flutie had knowledge but which were never set forth in Flutie N.Y.'s schedule of assets on its tax returns. Michael Flutie was instrumental in procuring the breach of the contracts with these models, by having the models work for Flutie Media and other Flutie entities, including Victoria Suns, Flutie Entertainment, and other top modeling agencies. It is clear from the evidence that there would not have been a breach but for the conduct of Michael Flutie.

41. Michael Flutie was responsible for the transfer of these model contracts and/or Flutie N.Y.'s arrangements for the services of the models it represented without any corresponding payment or other consideration.

42. Through a course of wrongful conduct, Michael Flutie destroyed the financial well being of Flutie N.Y. and transferred the model contracts and/or its arrangements for the services of the models it represented to other entities under his control.

43. Because the Defendants failed to provide any records or accounting of such transfers, they are hereby directed to give an accounting of and turn over to the Trustee all monies received, and all future monies, on account of all the models at Flutie N.Y. as of April 2001.

### Alter Ego and Piercing the Corporate Veil

44. Under New York law, the corporate form is a legitimate means used to protect individual liability and courts are reluctant to pierce it. *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979). In order to pierce the corporate veil, a party must demonstrate that (1) the owner has exercised such control that the corporation has become a mere instrumentality of the owner, which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to the

plaintiff. *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir.1991). In addition, New York law provides for piercing the corporate veil when the corporation has been so dominated by an individual and its separate entity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego. *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir.1989).

45. Courts will find liability when doing so would achieve an equitable result. *Brunswick Corp. v. Waxman*, 599 F.2d 34, 35 (2d Cir.1979). Considering all the variables that must be factored into a decision to pierce the corporate veil, the Second Circuit has declared that the determination must be based on the specific facts of the case. *Mag Portfolio Consult, GmbH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir.2001).

46. Factors to be considered in the determination of control or domination sufficient to pierce the corporate veil include: (1) the absence of corporate formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping corporate records; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlap in ownership, officers, directors and personnel; (5) common office space, address and telephone number; (6) the amount of business discretion displayed by the allegedly dominated corporation; (7) whether the related corporations deal with the dominated corporation at arms length; (8) whether the corporations are treated as independent profit centers; (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group; and (10) whether the corporation in question had property that was used by other of the corporations as if were its own. *Wm. Passalacqua Builders, Inc.*, 933 F.2d at 139.

47. To assert a claim for individual liability under an alter ego theory one must plead two elements: (1) that the person exercises such complete domination and control with respect to the transaction attacked that the corporation had, at the time, no separate will of its own, and (2) that this domination was used to commit fraud or wrong against the plaintiff which caused the plaintiff's injury. *Leykis v. NYP Holdings, Inc.*, 899 F.Supp. 986, 991 (E.D.N.Y.1995).

48. Here, the elements present warrant a finding of individual liability under an alter ego theory against Michael Flutie. Evidence reflects that Michael Flutie was using Flutie N.Y. and then later Flutie Media, to suit his own needs, and was using corporate funds for his own personal use. It is clear that Michael Flutie had exclusive control over the operations of Flutie N.Y., and with this control he committed wrongful acts which resulted in significant losses by Flutie N.Y.

49. Again, Michael Flutie argues that *Ravens* is applicable to this case. The *Ravens* Court did not pierce the corporate veil where it found no evidence that the principal had abused the corporate form, by withdrawing corporate monies to pay her personal expenses and obligations, to perpetrate a wrong against the plaintiff. There, in the context of a recognized legitimate commercial dispute between the parties, the Court merely held it would not pierce the corporate veil where there was all the indicia of fair consideration for the transfers at issue. *Ravens*, 267 A.D.2d at 529, 699 N.Y.S.2d 503. Such indicia of fair consideration are absent here. As noted above, I find that the transfers to Michael Flutie, as well as the transfers to Albert Flutie on behalf of Michael, were made without fair consideration to Flutie N.Y. The facts are clear that Michael Flutie

abused the corporate form and thereby, harmed Flutie N.Y.

50. Further, there is sufficient evidence that Flutie Media acted as the alter ego of Flutie N.Y. Flutie N.Y. fraudulently transferred model management contracts and/or its arrangements for the services of the models it represented to Flutie Media for no consideration. Flutie Media, under the control of Michael Flutie, continued to operate a modeling agency, continued to represent themselves to the public as Company Management and continued to earn commissions on the work performed by the former Flutie N.Y. models.

51. Sufficient factors are also present to warrant the piercing of the corporate veil and a finding that Michael Flutie is liable for any and all damages suffered by Flutie N.Y. It is clear from the evidence adduced during discovery that no corporate formalities were followed. There were no board of directors meetings, no board meetings or votes, and stock certificates were never issued. *See Electronic Switching Indus., Inc. v. Faradyne Elec. Corp.,* 833 F.2d 418, 424 (2d Cir.1987) (to pierce corporate veil, plaintiff must demonstrate that control and domination was used to commit wrong, fraud or breach of legal duty or a dishonest and unjust act).

52. Several entities shared common office space with Flutie N.Y. without paying rent, including Flutie Media, Flutie Entertainment, Flutie Bros. and Victoria Suns.

53. Another factor to consider when determining whether to pierce the corporate veil is inadequate capitalization. It is clear from the books and records of Flutie N.Y. that from at least December 31, 1997 through December 31, 2000, the company's liabilities exceeded its assets. In addition, the company had income losses on its income statements in 1995, 1996, 1997, 1998, and 2000. These factors illustrate that from the beginning of the corporation, the business was under capitalized.

54. Michael Flutie looted Flutie N.Y. and used the corporate veil as a sham through which to engage in conduct intended to deprive the Debtor's legitimate creditors of assets of the Debtor. Albert Flutie acquiesced in and permitted his son to engage in conduct injurious to Flutie N.Y. They disregarded corporate form and acted as though the Debtor's assets were theirs alone to manage and distribute.

55. Albert Flutie, as the 100% shareholder, and Michael Flutie, as the de facto President and dominant control figure of Flutie N.Y., knew or recklessly disregarded the deleterious effects of their conduct on the Debtor and its unsecured creditors.

56. Based on the facts alleged, the Trustee has provided the Court with the requisite proof to support a claim for alter ego against Michael Flutie, and Michael Flutie is, therefore, personally responsible for all of the debts of the Debtor's Estate.

SUBMIT AN ORDER AND JUDGMENT CONSISTENT WITH THIS DECISION.