### In re THE CASSANDRA GROUP, Debtor.

### Robert L. Geltzer, as Chapter 7 Trustee of the Cassandra Group, Plaintiff,

### v.

### Artists Marketing Corp., the Bathgate Group, and Lawrence Bathgate, Defendants.

Bankruptcy No. 00–B–41807 (BRL).
Adversary No. 02–02714.

United States Bankruptcy Court, S.D. New York.

Jan. 11, 2006.

Steven M. Cohen, Kronish, Lieb, Wiener & Hellman LLP, Robert A. Wolf, Bryan Cave LLP, New York, NY, for Debtor.

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BURTON R. LIFLAND, Bankruptcy Judge.

Robert L Geltzer, as Chapter 7 trustee (the "Trustee") of the debtor the Cassandra Group ("Cassandra" or the "Debtor"), brought this action pursuant to section 547 of title 11, United States Code (the "Bankruptcy Code") to avoid a transfer from the Debtor to defendants, Artists Marketing Corporation ("AMC"), Lawrence E. Bathgate ("Bathgate") and the Bathgate Group (collectively, "Defendants"). The Complaint includes various causes of action for the avoidance of fraudulent conveyances under the Bankruptcy Code and New York State Debtor Creditor Law and one cause of action for unjust enrichment.

Trial was conducted before the Court on October 24, 2005. Each party was provided with the opportunity to hear from any proffered witnesses, and approximately 33 exhibits were entered into evidence. Having considered all of the evidence, testimonial and documentary, as well as the arguments of the parties, and their Proposed Findings of Fact and Conclusions of Law, and keeping in mind that a court should not blindly accept findings of fact and conclusions of law proffered by the parties, *St. Clare's Hospital and Health Center v. Insurance Company of North America (In re St. Clare's Hospital and Health Center)*, 934 F.2d 15 (2d Cir.1991)(citing *U.S. v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964)), and having conducted an independent analysis of the law and the facts, this Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### I. PROCEDURAL BACKGROUND

1. On or about April 3, 2000, pursuant to an Order entered in a civil enforcement proceeding captioned *Securities and Exchange Commission v. Dana C. Giacchetto and The Cassandra Group, Inc.*, Civil Action No. 00 Civ. 2502, in the United States District Court for the Southern District of New York, Steven M. Cohen, Esq. was appointed as the Temporary Receiver (the "Receiver") of Cassandra.

2. On July 21, 2000 (the "Petition Date"), the Receiver commenced this liquidation case by filing on behalf of Cassandra a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

3. Pursuant to the United States Trustee's Notice of Appointment of Interim Trustee and Trustee, Robert L. Geltzer, Esq., was appointed Chapter 7 Trustee for

the estate of the above-captioned Debtor and is now acting as such Trustee.

4. The Trustee filed the Complaint, commencing this proceeding on July 21, 2002. (*See* Exhibit P49.)[1] Defendants have all filed answers.

## II. BACKGROUND OF AMC AND THE AGREEMENTS

5. AMC was a corporation designed to exploit the licensing of certain merchandising and other intellectual property rights in artists and other talented individuals. (*See* Exhibit P49, ¶ 16; Exhibits P50 and P51, ¶ 16.)

### A. The Consulting Fee Agreement

6. In or about July 1999, Cassandra, Dana Giacchetto ("Giacchetto"), Cassandra's principal, and Bathgate, as a principal of AMC, entered into the Cassandra Consulting Fee Agreement (the "Consulting Fee Agreement"), pursuant to which, among other things, AMC was to pay Cassandra and Giacchetto $100,000 per month for their consulting services. (*See* Exhibit P49–P51, ¶ 17; Tr. at p. 18, line 25—p. 19, line 8.)[2]

7. Under the Consulting Fee Agreement, AMC engaged Cassandra to act as its exclusive consultant, and Cassandra agreed to provide professional consulting services to AMC. (*See* Exhibit P3, ¶ 1.)

8. Pursuant to the Consulting Fee Agreement, Cassandra provided advice on the selection of artists and talent for its venture with AMC and gave advice with respect to the financial structuring of transactions, pursuant to paragraphs 1(a) and 1(b), respectively, of the Consulting Fee Agreement. (*See* Exhibit P47, p. 49, line 13—p. 50, line 5; Exhibit P3, ¶ 1; Tr. at p. 22, lines 3–24.)

9. Indeed, Cassandra's principal, Dana Giacchetto, introduced AMC to Leonardo DiCaprio, a well-known celebrity at the time. (Tr. at p. 165, lines 22–24.) Pursuant to that introduction, DiCaprio signed an agreement with AMC, dated as of September 30, 1999 (the "DiCaprio Agreement"), permitting AMC, among other things, to acquire and exploit from DiCaprio certain rights to his name, likeness, characteristics, visual representations, and signature trademarks. (*See* Exhibit P10, and 1st Whereas clause therein.) The sum of $2.5 million dollars was provided to DiCaprio as consideration for signing the agreement. This fulfilled one of Cassandra's key obligations under the Consulting Fee Agreement. (*See* Exhibit P46, p. 54 line 18—p. 55, line 11; Tr. at p. 23, line 6—p. 24, line 8.) Giacchetto also introduced AMC to other entertainment stars. (*See* Tr. at p. 169, lines 7–12.)

10. Cassandra's principal spent time at meetings involving AMC. (*See* Tr. at p. 169, line 17—p. 170, line 13.) Cassandra was even involved in the general discussions of taking AMC to an initial public offering, pursuant to paragraph 1(c) of the Consulting Fee Agreement. (*See* Exhibit P47, p. 53 line 21—p. 55, line 16; Tr. at p. 25, line 17—p. 27, line 18; Exhibit P3, ¶ 1.)

11. As compensation for these services, Cassandra was entitled to be paid a $100,000 monthly consulting fee. (*See* Exhibit P3, ¶ 3(a).) In or about September 1999, at about the time that the DiCaprio Agreement was executed, AMC paid Cassandra its first $100,000 monthly consulting fee—which was the only consulting fee

---

1. Citations denoted as "Exhibit P__" refer to the Plaintiff's Exhibits, admitted into evidence at the Trial. Citations denoted as "Exhibit D__" refer to the Defendants' Exhibits, admitted into evidence at the Trial.

2. Citations to "Tr. at p. ——" refer to the transcript of the Trial.

AMC paid Cassandra. (*See* Exhibit P47, p. 57, line 10—p. 58, line 9; Tr. p. 28, line 23—p. p. 30, line 3.)

12. Nowhere did the Consulting Fee Agreement provide that Cassandra is obligated to reimburse AMC for any expenses AMC may have incurred. (*See generally* Exhibit P3.) Indeed, the Consulting Fee Agreement provided that AMC would indemnify Cassandra and hold Cassandra harmless from "any and all ... costs and expenses ..., to which any of them may become subject or which any of them may sustain o[r] incur as a result of, or in connection with, any matter which relates to this agreement or the engagement of Cassandra hereunder." (*See* Exhibit P3, ¶ 4.)

13. Cassandra's liability was specifically limited under the Consulting Fee Agreement, as follows:

> Neither Cassandra nor any of the indemnified parties shall have any liability to AMC as a result of or in connection with any matter that relates to this agreement or the engagement of Cassandra hereunder except for damages that are ***finally judicially determined*** to have resulted primarily from his or its bad faith or gross negligence.

(Exhibit P3, ¶ 4) (emphasis supplied.)

14. AMC never obtained—or even sought—such a judicial determination against Cassandra. (*See* Tr. at p. 171, line 21—p. 172, line 3; *See also* Exhibit P47, p. 61, line 23—p. 62, line 7; Tr. at p. 31, line 22—p. 32, line 9.)

### B. *The Letter Agreement and the Escrow Agreement*

15. In or about September 1999, AMC, Cassandra, Giacchetto, and the Bathgate Group (defined in the Letter Agreement as comprising "Lawrence E. Bathgate and/or affiliates") entered into a letter agreement concerning a possible private placement in connection with AMC (the "Letter Agree-

ment"). (*See* Exhibits P49–P51, ¶ 18. *See also* Exhibit P6, at p. 1 ¶ 3, and at pp. 5–6)

16. At or about this same time, AMC, Cassandra, Giacchetto, the Bathgate Group, and Frankfurt, Garbus, Klein & Selz, P.C. ("Frankfurt Garbus") entered into an escrow agreement (the "Escrow Agreement"), purportedly to secure certain obligations of Giacchetto and Cassandra under the Letter Agreement. (*See* Exhibits P49–P51, ¶ 18.).

17. The Letter Agreement, the Escrow Agreement, and the DiCaprio Agreement (described above) are all dated as of September 30, 1999. (*See* Exhibits P6, P9, and P10.)

18. Under the terms of the Letter Agreement, (i) Bathgate and his affiliates were to provide $2.5 million of funding upon the execution of the DiCaprio Agreement; and (ii) within 90 days of that, Cassandra was to secure $2.5 million of third party investments in AMC. (*See* Exhibit P6, ¶¶ 1 and 3.)

19. Also, Cassandra agreed that if AMC, with Cassandra's help, did not sign up five additional "A level" stars (after Leonardo DiCaprio), within 90 days, then the Bathgate Group "would have the right to cause AMC to apply the Third Party Investment in full to the repurchase of Bathgate's investment" of $2.5 million in AMC. (*See* Exhibit P6, ¶ 4.)

20. Lawrence Bathgate admitted that the purpose of the Letter Agreement was to ensure that if Cassandra failed in its obligation to raise another $2.5 million from third parties, the Bathgate Group was entitled to get its own $2.5 million back. (*See* Exhibit P47, p. 103, line 14—p. 104, line 11; Tr.. at p. 37, line 7—p. 38, line 7.)

21. The venture memorialized by the Letter Agreement was, in the words of Bathgate, "a collaborative effort"; Cassandra "had to produce" the stars, but AMC

"had to then close the deal ...." (*See* Exhibit P47, p. 129, lines 12–13; Tr. at p. 40, lines 6–8; *see also* Tr. at p. 167, lines 8–10.) Indeed, the Letter Agreement itself discusses what would occur if "AMC, with the help of Dana and Cassandra, has not signed five (5) additional 'A' list stars to license agreements ...." (*See* Exhibit P6, ¶ 4) (emphasis supplied.)

22. Nowhere did the Letter Agreement provide that Cassandra is obligated to reimburse AMC for any expenses it may have incurred. (*See generally* Exhibit P6.) Moreover, that agreement explicitly provides that it "(i) may only be modified by a written instrument executed by Dana, Cassandra, AMC and the Bathgate Group" and "(ii) sets forth the entire agreement of Dana and Cassandra and AMC and the Bathgate Group with respect to the subject matter hereof." (*See* Exhibit P6, ¶ 7.)

### C. *Cassandra Deposited Funds in the Escrow Account*

23. Under both the Letter Agreement and the Escrow Agreement, Cassandra was to deposit a $500,000 sum "to partially secure the obligations of Dana and Cassandra provided in paragraphs 1, 3, and 4" of the Letter Agreement. (*See* Exhibit P6, ¶ 5(A); Exhibit P9, 2d "Whereas" Clause.)

24. Cassandra in fact deposited $500,000 of its funds into an escrow account maintained by Frankfurt Garbus. (*See* Exhibit P7; Exhibit P47, at p. 106, lines 14–17; Tr. at p. 42, line 7—p. 43, line 24.)

### III. *AMC ALLOWED DICAPRIO TO RESCIND HIS AGREEMENT, EVEN THOUGH AMC DID NOT BELIEVE THAT DICAPRIO HAD A RIGHT TO DO SO*

#### A. *AMC Allowed DiCaprio To Rescind His Agreement*

25. On or about October 28, 1999—less than a month after the effective date of the Letter Agreement and the DiCaprio Agreement—DiCaprio transmitted a letter to AMC purporting to rescind the DiCaprio Agreement. (*See* Exhibit P26.)

26. AMC accepted DiCaprio's rescission in a letter dated November 3, 1999. (*See* Exhibit P26; *see also* Exhibit P46, p. 49, lines 15–22; Tr. at p. 46, lines 9–20.)

27. AMC entered into a settlement agreement with DiCaprio, among others, dated as of November 17, 1999 (the "DiCaprio Settlement Agreement"). (*See* Exhibit P14.) Cassandra was not a party to this agreement. (*See id.*)

28. AMC's representatives only asked DiCaprio's attorneys for return of the $2.5 million that AMC provided to DiCaprio, along with another $50,000 that it had paid to DiCaprio's attorneys for their legal fees. (*See* Exhibit P47, at p. 159, line 4—p. 160, line 7; Exhibit P46, at p. 47, line 19—p. 48, line 3.) Bathgate and his counsel never asked any of DiCaprio's representatives to reimburse AMC or Bathgate for their expenses. (*See* Tr. at p. 168, line 21—p. 169, line 6. *See also* Exhibit P46, at p. 50, line 16—p. 51, line 8.) When asked why he did not ask DiCaprio's attorneys for reimbursement of AMC's and his expenses, Bathgate testified at his deposition, "It never occurred to me to do that." (*See* Exhibit P47, at p. 160, lines 2–7; Tr. at p. 56, lines 13–20.)

29. AMC got back all that it had asked from DiCaprio: $2.55 million. (*See* Tr. at p. 167, line 21—p. 168, line 7. *See also* Exhibits P17 and P18; Exhibit P14, ¶ 2; Exhibit P47, at p. 190, line 12—p. 191, line 3; Exhibit P47, at p. 193, lines 12–22; Tr. at p. 59, line 7—p. 60, line 15.) AMC was "happy" to get this money back. (*See* Exhibit P46, at p. 47, line 19—p. 48, line 3; Tr. at p. 56, line 25—p. 57, line 12.) In-

deed, Bathgate's counsel agreed that the discussions during negotiations of the DiCaprio Settlement Agreement were all focused on the $2.55 million, and testified that "at that point in time the result for the client to get back all the money paid including legal fees was a good result given the circumstances." (*See* Exhibit P46, p. 65, lines 14–20; Tr. at p. 60, line 20—p. 61, line 5.)

### B. *AMC Was Aware That DiCaprio Had No Legal Basis for Rescission*

30.  Although, according to Bathgate, DiCaprio's attorneys had "indicated the agreement was going to be rescinded because if Leo [DiCaprio] had known that Dana was involved in AMC, Leo would not have gone into the agreement" (Tr. at p. 140, lines 21–24), Bathgate testified that, in fact, DiCaprio had been aware that Cassandra was in the deal. (*See* Tr. at p. 166, lines 2–6.)

31.  Bathgate indicated at trial that he did not believe that DiCaprio had any legal basis for rescinding his agreement with AMC. (*See* Tr. p. 166, line 7—p. 167, line 20. *See also* Exhibit P47, p. 157, lines 14–25, and p. 165, lines 7–20, Tr. at p. 53, lines 4–15, and p. 54, line 18—p. 55, line 10.) Notwithstanding that fact, Bathgate still permitted DiCaprio to rescind that agreement. (*See* Tr. at p. 167, lines 16–20.)

32.  Indeed, Bathgate's counsel admitted that the decision to accept DiCaprio's rescission was a "business judgment." (Tr. at p. 235, lines 5–6.) Bathgate had testified at his deposition:

> In a technical sense I didn't think he [DiCaprio] had standing to terminate the agreement. But I also knew instinctively if you have a personal service contract with someone who doesn't want to do the deal anymore, whatever the

reason is, it is not worth the headache to be involved.

(Exhibit P47, p. 157, lines 19–25: Tr. at p. 53, lines 8–15.)

### C. *DiCaprio and AMC Were Responsible for the AMC Venture Failing*

33.  DiCaprio was necessary to the AMC venture. (*See* Exhibit P47, p. 87, lines 10–16; Tr. at p. 51, line 25—p. 52, line 9. *See also* Exhibit P46, p. 36, lines 10–17; Tr. at p. 52, lines 13–23.) Yet, as noted above, Bathgate permitted DiCaprio to rescind, even though Bathgate did not believe that DiCaprio had a legal basis to do so.

34.  At Trial, Bathgate made admissions evidencing that DiCaprio, rather than Cassandra, was the reason why the AMC venture failed. He indicated that "the Artists Marketing deal was pulled by DiCaprio," and that other stars who might have done business with AMC, such as "a Ben Afleck [sic] or a Matt Damon or a Toby Maguire or Cameron Diaz" were "part quote, unquote, of Leo's posse at the time." (*See* Tr. at p. 149, lines 3–8.)

### IV. *THE TERMINATION AGREEMENT AND TRANSFER OF FUNDS FROM ESCROW TO AMC*

35.  Under the Letter Agreement, Cassandra had 90 days after the execution of the DiCaprio Agreement to raise the requisite money for third party investments in AMC (*see* Exhibit P6, ¶ 3; Exhibit P47, p. 111, line 10—p. 112, line 6; Tr. at p. 38, line 11—p. 39, line 9); and to assist with finding the five additional A level stars (*see* Exhibit P6, ¶ 4). However, the Letter Agreement remained in effect for less than a month. (*See* Tr. at p. 172, lines 4–15.)

36.  In or about late November 1999, AMC, the Bathgate Group, and Giacchetto, on behalf of Cassandra, entered into a Termination, Settlement and Release

Agreement, dated as of October 28, 1999 (the "Cassandra Termination Agreement"), which, among other things, purported to terminate the Letter Agreement and the Escrow Agreement. (*See* Exhibits P49–P51, ¶ 20.)

37. Under the terms of the Cassandra Termination Agreement, the Letter Agreement and the Consulting Fee Agreement were both terminated as of October 28, 1999. (*See* Exhibit P15, at p. 2; Tr. at p. 62, lines 14–24.)

38. Bathgate demanded from Cassandra and Giacchetto reimbursement of the $100,000.00 paid pursuant to the Consulting Agreement and expenses incurred, inclusive of the consulting fee, exceeding $430,000.00.

39. The Cassandra Termination Agreement provided that Giacchetto and Cassandra would "refund to AMC the initial consulting fee ($100,000), and pay to AMC the sum of $200,000 representing reimbursement to AMC of a portion of the fees and expenses it incurred." (*See* Exhibit P15, at p. 2; Tr. at p. 62, line 25—p. 63, line 6.)

40. Giacchetto agreed to direct $300,000 of Cassandra's funds to be released from the escrow account, maintained by Frankfurt Garbus, directly to AMC, purportedly to repay AMC's payment of $100,000 to Cassandra and to reimburse AMC for $200,000 worth of alleged expenses AMC incurred. (*See* Exhibits P49–P51, ¶ 21.) In or about late November 1999, the escrow agent in fact released $300,000 of Cassandra's funds to AMC. (*See id.*, ¶ 22.)

41. AMC received $300,000 of Cassandra funds (the "Cassandra Transfer") from the escrow account. (*See* Exhibit P47, at p. 202, lines 16–25; Exhibit P47, at p. 204, lines 22–24; Tr. at p. 65, lines 8–22. *See also* Exhibits P21–22.)

## V. *BATHGATE AND THE BATHGATE GROUP BENEFITED FROM THE TRANSFER TO AMC*

42. Defendants contend that AMC transferred the proceeds of the $300,000 transfer to various parties and none of those parties were named defendants in the complaint. The Defendants state that neither Bathgate nor BG are immediate or mediate transferees of AMC and therefore, the Trustee cannot recover the transferred amount from them.

43. However, the Court finds that the transfer from the escrow account to AMC necessarily benefited the other Defendants, Bathgate and the Bathgate Group, for several reasons. First, Bathgate signed the Consulting Fee Agreement "As principal for AMC." (*See* Exhibit P3, at p. 2.) Bathgate testified at the Trial that AMC's "stock never got issued" and that AMC "was a concept." (Tr. at p. 130, lines 8–9.)

44. Second, Bathgate testified at his deposition about the relationship among AMC, the Bathgate Group, and himself, as follows:

> "Question: When you say 'we retained' you mean the Bathgate Group or Artists Marketing Corporation or both?
>
> Answer: Just remember the Artists Marketing Group at this point in time is *simply a shell entity* without any assets. It doesn't own anything. It doesn't lease space anywhere. It has no money in the bank. *It is Tom Schell formed XYZ Corporation, he has it,* that will be the entity but now you have to go out and hire someone to start doing the paperwork. *They will want to know who will pay them, so that is me*. I make sure that gets taken care of. So that is what this is all about."

(*See* Exhibit P47, at p. 95, line 16—p. 96, line 5; Tr. at p. 202, lines 8–23) (emphasis supplied.) Bathgate also testified at Trial

that, when it was operating, AMC "got funded on an as-needed basis" and was "funded from essentially money [Bathgate] personally provided." (Tr. at p. 160, lines 6–12.)

45. Third, the Bathgate Group was a signatory to the Letter Agreement, the Escrow Agreement, and the Cassandra Termination Agreement, pursuant to which AMC received the Cassandra Transfer, and, in both cases, Bathgate signed on behalf of the Bathgate Group. (*See* Exhibit P6, at p. 6; Exhibit P9, at p. 6; Exhibit P15, at p. 13.) As noted above, the "Bathgate Group" was defined in the Letter Agreement as comprising "Lawrence E. Bathgate and/or affiliates." (*See* Exhibit P6, ¶ 3.)

46. AMC borrowed $3,000,000.00 at 15% interest as working capital in reliance upon the professed special relationship between Cassandra and its celebrity clientele. Van Beuren Management, Inc.[3] loaned AMC $1,500,000.00 as evidenced by a promissory note dated September 28, 1999 (the "Van Beuren Note") (Ex. D–6). Additionally, P & L Capital Investments, LLC loaned AMC $1,500,000.00 as evidenced by a promissory note dated September 23, 1999 (Ex. D–7 or tab 36 in Plaintiff's binder of trial exhibits). The indebtedness under the Van Beuren Note, including interest, was paid out of the same bank account into which the Cassandra Transfer was deposited, which was being maintained at Bathgate's law firm, Bathgate Wegener & Wolf, for AMC. (*See* Tr. at p. 182, line 18—p. 183, line 10. *See also* Exhibit D3, at p. 2; Tr. at p. 191, line 18—p. 192, line 15.) At that time, Bathgate was a shareholder of Bathgate Wegener & Wolf.

## VI. CASSANDRA WAS INSOLVENT AT THE TIME OF THE CASSANDRA TRANSFER, AND CREDITORS EXISTED AT THAT TIME

### A. Cassandra Was Insolvent

47. As of late November 1999, the date of the Cassandra Transfer, under the three recognized standards for evaluating solvency, *i.e.*, the balance sheet approach, the capitalization approach, and the cash flow approach, Cassandra was insolvent. (Tr. at p. 96, line 12—p. 97, line 3. *See also* Exhibit P56, ¶ 10, 24.)

### The Balance Sheet Approach and Capitalization Approach

48. Cassandra's net worth as of the end of calendar year 1996 (and, thus, the beginning of 1997) was *negative* $131,534. (*See* Exhibit P56, ¶ 12) Cassandra's net worth for each of the years ended 1997, 1998, and 1999 was, respectively, *negative* $818,327, *negative* $1,671,598, and *negative* $2,452,475. (*See id.*)

49. Cassandra suffered a *loss*, rather than a profit, for each of the years ended 1997, 1998, and 1999, in the following amounts, respectively: $863,812, $738,490, and $713,161. (*See* Exhibit P56, ¶ 13.)

50. Therefore, during the period January 1, 1997 through December 31, 1999 (the "Applicable Period"), which time period includes the date of the Cassandra Transfer, Cassandra (i) had negative equity; and (ii) suffered substantial losses. (*See* Exhibit P56, ¶ 14.) Pursuant to the balance sheet approach, Cassandra was insolvent during the Applicable Period. (*See id. See also* Tr. at p. 84, line 3—p. 90, line 15.)

51. Further, because Cassandra had *negative* equity during the Applicable Period, Cassandra had insufficient (in fact,

---

**3.** Van Buren Management and Mr. Bathgate were "partners in a variety of ventures," and

had "worked closely" together. (*See* Tr. at p. 175, lines 11–22.)

negative) capital pursuant to the Capitalization Approach. (*See* Exhibit P56, ¶ 14. *See also* Tr. at p. 90, line 16—p. 92, line 20.)

**The Cash Flow Approach**

52. Cassandra was required to pay overdraft fees 126 times over the period from March 1997 through March 2000, and such overdraft fees aggregated $7,107. (*See* Exhibit P56, ¶ 17. *See also* Tr. at p. 93, line 21—p. 94, line 8.) The Overdraft Analysis reflects the fact that, with respect to each overdraft payment, Cassandra had written a check or checks in amount(s) greater than the amount available in Cassandra's bank account at the time. (*Id.*)

53. Further, several proofs of claim filed in this bankruptcy case contain evidence that Cassandra misappropriated funds, stock, and/or other assets from its clients during the Applicable Period. For example, several proofs of claim (included in Exhibit P56, in the attached exhibit J) include evidence that, according to the Financial Records, Cassandra (i) misappropriated hundreds of thousands of dollars from Gordon Baird between February and December 1998; and (ii) misappropriated thousands of dollars from Craig Kanarick in late 1998. (*See* Exhibit P56, ¶ 20. *See also* Tr. at p. 95, line 19–24.)

54. The foregoing instances (i) of Cassandra's numerous overdrafts, and (ii) of Cassandra's misappropriation of funds from its clients and its failure to pay debts it incurred, during the Applicable Period, are evidence that, during this period, Cassandra was incurring debts beyond its ability to pay them as they came due. (*See* Exhibit P56, ¶ 23. *See also* Tr. at p. 95, line 25—p. 96, line 7.)

55. Based on the foregoing and on the analyses and documents attached to the report of the Trustee's accountant, Andrew Plotzker, in Exhibit P56, (i) Cassandra was insolvent continuously from the beginning of 1997 through the end of 1999; (ii) accordingly, as of late November 1999, the approximate date of the Cassandra Transfer, Cassandra was insolvent; (iii) as of late November 1999, Cassandra's capital was unreasonably small—in fact, negative; and (iv) as of late November 1999, Cassandra was incurring debts beyond its ability to pay as they matured. (*See* Exhibit P56, ¶ 24. *See also* Tr. at p. 96, line 12—p. 97, line 3.)

**B. Creditors Existed at the Time of the Transfer**

56. At least three creditors with allowed claims in this bankruptcy case existed as of late November 1999, the date of the Cassandra Transfer. As noted in Exhibit P56, Gordon and Joann Hart Baird, who had filed Claim No. 5, and, as amended, Claim No. 15 (the "Baird Claim"), and Craig Kanarick, who had filed, Claim No. 14 (the "Kanarick Claim"), were creditors of Cassandra since 1998. (*See* Exhibit 56, ¶ 20, and exhibit J thereto.)

57. The Baird and Kanarick Claims were allowed in reduced amounts, pursuant to Stipulations and Orders in settlement thereof, entered by this Court, respectively, on December 1, 2004, and June 18, 2004. (*See* Exhibit 56, exhibit J.)

**VII. THE CASSANDRA TRANSFER PLUS PRE–JUDGMENT INTEREST TOTAL**

58. The interest on the $300,000 Cassandra Transfer, at 9% simple interest, should be calculated from the time of the demand for return of the transfer, July 21, 2002, through the date a judgment is entered.

**VIII. CONCLUSIONS OF LAW**

**I. JURISDICTION AND VENUE**

1. The United States District Court for the Southern District of New York has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. By virtue of 28 U.S.C. § 157(a), and the Order dated July 10, 1984 of District Court Judge Robert J. Ward of the United States District Court for the Southern District of New York, this adversary proceeding is automatically referred to the United States Bankruptcy Court for the Southern District of New York.

1. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).

2. Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409.

## II. *THE CASSANDRA TRANSFER SHOULD BE AVOIDED AS A CONSTRUCTIVE FRAUDULENT CONVEYANCE, AS ALLEGED IN COUNTS 7 AND 8, PURSUANT TO 11 U.S.C. § 544(b) AND §§ 273, 274, AND 275 OF THE NEW YORK DEBTOR AND CREDITOR LAW*

### A. *The Cassandra Transfer Was Made Without Fair Consideration*

1. Under 11 U.S.C. § 544(b)(1), a Trustee may avoid a transfer by a debtor by showing that the transfer could have been avoided by an unsecured creditor under the New York Debtor and Creditor Law ("NYDCL").

2. Under sections 273, 274, and 275 of the NYDCL, the transfer is avoidable if it was:

made without "fair consideration," as defined in the statute, and any of the following conditions is met: 1) the transferor is insolvent or will be rendered insolvent by the transfer in question; ... 3) the transferor is engaged or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital;

or 4) the transferor believes that it will incur debts beyond its ability to pay. *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 302 B.R. 760, 778 (E.D.N.Y.2003) *aff'd* 403 F.3d 43 (2d Cir.2005). *See also Kittay v. Flutie New York Corp. (In re Flutie New York Corp.)*, 310 B.R. 31, 52–55 (Bankr. S.D.N.Y.2004) (Lifland, J.).

3. Under the NYDCL:

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

NYDCL § 272. *See also In re Flutie*, 310 B.R. at 53.

4. The evidence at Trial demonstrated both (i) that the Cassandra Transfer was not exchanged for a fair equivalent or made to secure an advance or antecedent debt; and (ii) that the Cassandra Transfer was not made in good faith. Where, as here, the Defendants fail to show either fair equivalence or good faith in the transaction, the transfer should be avoided. *See generally Lawson v. Barden (In re Skalski)*, 257 B.R. 707, 710 (Bankr. W.D.N.Y.2001) (the "test under § 272(a) contain[s] the following elements: (1) defendant, as recipient of debtor's property must either (a) convey property in exchange, or (b) discharge an antecedent debt in exchange, and (2) such exchange must be a fair equivalent of the property received; and (3) such exchange must be in 'good faith'."). *See also In re Skalski,*

257 B.R. at 711 ("fair value is not sufficient if bad faith taints the transaction").

### Lack of fair equivalence or antecedent debt

■ 5. The Cassandra Termination Agreement provides that the Defendants would receive $300,000, consisting of a refund of the $100,000 consulting fee, and reimbursement of $200,000 of alleged expenses incurred by AMC (*see* Exhibit P15, at p. 2). The evidence shows that Cassandra satisfied its obligations under the Consulting Fee Agreement—including introducing AMC to DiCaprio, as well as other stars—and, thus, Cassandra earned its initial consulting fee. (*See* Findings of Fact ["FF"], ¶¶ 8–10.) The Consulting Fee Agreement, pursuant to which the fee was paid, includes no provision that would allow AMC to receive a refund; in fact, the agreement specifies that AMC would indemnify *Cassandra* for its expenses, rather that *vice versa.* (*See* Exhibit P3, ¶ 4.) Moreover, Cassandra would only be liable under the Consulting Fee Agreement upon a final judicial determination of bad faith or gross negligence on Cassandra's part, which AMC admitted it neither sought nor obtained. (*See* FF, ¶¶ 13–14.)

6. With respect to expenses, there is no provision in the Letter Agreement that obligated Cassandra to reimburse any of AMC's expenses. (*See generally* Exhibit P6.) Although Cassandra had to put up $500,000 in escrow to cover certain obligations under the Letter Agreement, the use of those escrowed funds was specifically circumscribed: "to partially secure the obligations of Dana and Cassandra provided in paragraphs 1, 3, and 4" of the Letter Agreement. (*See* FF, ¶ 23.) Paragraph 4 only gives the Bathgate Group the right to pursue Cassandra for return of the Bathgate Group's $2.5 million investment. (*See* Exhibit P6, ¶ 4.) And, Bathgate admitted that the purpose of paragraph 3 was to allow him to get back his $2.5 million investment if Cassandra could not raise another $2.5 million of third party investments. (*See* FF, ¶ 20.) Since Bathgate admitted that he received the entirety of his $2.5 million investment (as well as another $50,000 advance he made) back from DiCaprio (*see* FF, ¶ 29.), neither he nor the other Defendants were ever entitled to any amount of Cassandra's escrowed funds.

7. Despite the lack of any contractual basis for receiving this $300,000, the Defendants have alleged that, at the time of the Cassandra Transfer, they had some sort of claim against Cassandra based on the failure of the AMC venture. The Defendants contend that Cassandra received a benefit from the transfer in that Cassandra was released from the contract, from substantial claims and obtained the release of $1,200,000.00 in collateral. However, the evidence established that there never was a valid claim based on the failure of the AMC venture; Cassandra never guaranteed the success of the venture, but, rather, such success was dependent on "AMC, with the help of Dana and Cassandra." (*See* FF, ¶ 21.)

8. Indeed, while it is true that the additional investments and additional A-list stars contemplated in the Letter Agreement never materialized, the only evidence admitted at Trial did not establish that Cassandra was responsible for this. When DiCaprio sought to rescind his contract, the Defendants, not Cassandra, let him out—even though Bathgate admits that DiCaprio had no legal basis for rescission (*see* FF, ¶¶ 26 and 30–32.); Bathgate, not Cassandra, made the decision to do so because it was "not worth the headache to be involved" with DiCaprio after his attorneys asked for rescission (*see* FF, ¶ 32). AMC, not Cassandra, was party to the DiCaprio Settlement Agreement, where

DiCaprio received a full release in exchange for only giving AMC back its $2.5 million. (*See* FF, ¶¶ 26–29.) Finally, it was Bathgate, not Cassandra, who decided not to ask DiCaprio to reimburse him for his or AMC's expenses during settlement negotiations, because "it never occurred to [him] to do that." (*See* FF, ¶ 28.)

9. Bathgate admitted that DiCaprio was critical to the AMC venture, and suggested that by letting DiCaprio out of the deal, the other A-list stars that he sought to bring into the AMC venture were part of "Leo's posse." (*See* FF, ¶ 34.) This suggests that by letting DiCaprio out of the deal, AMC, not Cassandra, pulled the plug on the entire deal—including other A-list stars who might have been interested.

10. AMC's acceptance of DiCaprio's rescission, and its subsequent entry into the Cassandra Termination Agreement, ended the entire AMC venture with Cassandra effective October 28, 1999—less than 30 days after its inception. (*See* FF, ¶ 36.) Cassandra cannot be held liable for failing to perform all its obligations under the Letter Agreement, since AMC terminated that agreement, and allowed DiCaprio to rescind the DiCaprio Agreement without any legal basis therefor, while Cassandra had at least two more months to perform its obligations. (*See* FF, ¶ 35). *See, e.g., People of Porto Rico v. Title Guaranty & Surety Co.,* 227 U.S. 382, 389, 33 S.Ct. 362, 57 L.Ed. 561 (1913) ("If, within the time allowed for performance, the plaintiff made performance impossible, it is unimaginable that any civilized system of law would allow it to recover upon the bond for a failure to perform"); *See also* 6–25 Corbin on Contracts § 571 [2005] ("If a prom-

isee prevents or greatly hinders the other from rendering a promised performance, he cannot maintain action against that other for breach...").

11. All in all, the Defendants made a "business judgment" to accept DiCaprio's rescission. (*See* FF, ¶ 32.) Whatever the consequences of that judgment, those consequences should be borne by AMC, not by Cassandra—and certainly, not by Cassandra's creditors.

12. The only conceivable consideration that the Defendants could have provided in exchange for the Cassandra Transfer was a release included in the Cassandra Termination Agreement. However, for the foregoing reasons, the Defendants had no valid claim against Cassandra, and, thus, this release was not fair consideration. *See Bucki v. Singleton (In re Cardon Realty Corp.),* 146 B.R. 72, 80 (Bankr.W.D.N.Y. 1992) ("Defendants have not established any claim which the creditors committee would have had against Cardon. Therefore, the creditors committee had no claim to release with respect to Cardon, and there is no consideration.").

***Lack of good faith***

13. Besides showing the lack of a fair equivalent or antecedent debt, the evidence also shows a lack of good faith. Whatever the Defendants' reasons or motivations, the foregoing evidence shows that (i) they believed that DiCaprio breached his agreement with AMC; (ii) nevertheless, they did not seek from DiCaprio compensation for any fees or any alleged expenses they incurred in operating AMC; and (iii) they did seek such compensation from Cassandra, who was not a party to the DiCaprio Settlement Agreement.[4]

---

4. Effectively, the Defendants sought to have Cassandra pay them for obligations owed by a third party, i.e., Cassandra was paying for DiCaprio's release. This fact alone makes the Cassandra Transfer a fraudulent conveyance.

*See William Iselin & Co., Inc. v. Boardwalk Regency Corp.,* 703 F.Supp. 1084, 1087–88 (S.D.N.Y.1989) ("courts have long recognized that [t]ransfers made to benefit third parties are clearly not made for a 'fair' consider-

14. Since the Defendants knowingly pursued Cassandra for damages resulting from DiCaprio's breach of his agreement with AMC, the Cassandra Transfer was not made in good faith, regardless of what the Cassandra Termination Agreement provides.

### B. Cassandra Was Insolvent at the Time of the Cassandra Transfer, and Creditors Existed As of the Time of the Cassandra Transfer

15. As set forth above in the Proposed Findings of Fact, under all three recognized tests of solvency—balance sheet, capitalization, and cash flow—Cassandra was insolvent at the time of the Cassandra Transfer. (*See* FF, ¶¶ 47–55.)

■ 16. In addition, the above evidence of lack of fair consideration creates a presumption of insolvency and shifts the burden to the Defendants to prove solvency. As this Court has held:

> In applying Section 273 of the New York DCL, courts have raised a presumption of insolvency where, as here, a debtor has transferred his property without consideration when debts are outstanding.

*Hassett v. Far W. Fed. Savs. & Loan Assoc. (In re O.P.M. Leasing Servs., Inc.)*, 40 B.R. 380, 393 (Bankr.S.D.N.Y.1984) *aff'd* 44 B.R. 1023 (S.D.N.Y.1984) (also noting that "the New York Debtor and Creditor Law evinces a policy protective of creditors in placing the burden of going forward with proof of the debtor's solvency on the transferee[s]").

17. Also, as set forth above, at least three creditors—Craig Kanarick and Gordon and Joann Hart Baird—existed at the time of the Cassandra Transfer and could have avoided the Cassandra Transfer under the NYDCL. (*See* FF, ¶¶ 56–57.)

### C. The Trustee Can Recover the Value of the Cassandra Transfer from the Defendants

18. For the foregoing reasons, the Cassandra Transfer can be avoided under 11 U.S.C. § 544.

19. Pursuant to 11 U.S.C. § 550, the Trustee may recover the value of the transfer from "the initial transferee of such transfer or the entity for whose benefit such transfer was made."

■ 20. AMC was the initial transferee of the Cassandra Transfer, but the evidence shows that the Cassandra Transfer was also made for the benefit of the other Defendants, Bathgate and the Bathgate Group, for at least four reasons: (i) Bathgate signed the Consulting Fee Agreement "As principal for AMC," and AMC, whose "stock never got issued," was only "a concept"; (ii) Bathgate testified at his deposition that he effectively considered himself and AMC as equivalent: AMC was "simply a shell entity," "It is Tom Schell formed XYZ Corporation, he has it," "They will want to know who will pay them, so that is me"; further, when it was operating, AMC "got funded on an as-needed basis" and was "funded from essentially money [Bathgate] personally provided"; (iii) the Bathgate Group (for whom Bathgate signed) was party to the relevant agreements; and (iv) Bathgate was a co-obligor with AMC on promissory notes, which notes were repaid out of money from the same account into which the Cassandra Transfer was made. (*See* FF, ¶¶ 43–46.)

21. Accordingly, the Defendants are jointly and severally liable to the Trustee for the value of the Cassandra Transfer.

ation") (*quoting Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981)).

**III. THE CASSANDRA TRANSFER SHOULD BE AVOIDED AS AN INTENTIONAL FRAUDULENT CONVEYANCE, AS ALLEGED IN COUNTS 5 AND 6, PURSUANT TO 11 U.S.C. § 544(b) AND §§ 276 and 278 OF THE NEW YORK DEBTOR AND CREDITOR LAW**

22. Under 11 U.S.C. § 544(b)(1) and sections 276 and 278 of the NYDCL, the Cassandra Transfer can be avoided if it was made with "actual intent ... to hinder, delay, or defraud either present or future creditors."

■ 23. Defendants contend that the Trustee's failure to produce Giacchetto or other agents of the Debtor who could have testified to the "actual intent" element precludes the Debtor from recovery. However, Courts in this Circuit have held that where certain "Badges of Fraud" are present, an actual intent to hinder, delay or defraud either present or future creditors under section 276 of the NYDCL is presumed. One of these "Badges of Fraud" is a lack of consideration for a transfer. "Recognizing that it is typically difficult to demonstrate intent by direct evidence, the courts have identified various 'badges of fraud' that serve as circumstantial evidence of actual intent. The badges of fraud identified by the Second Circuit include: lack or inadequacy of consideration ...." *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 302 B.R. 760, 783–84 (E.D.N.Y.2003), *aff'd* 403 F.3d 43 (2d Cir. 2005). Therefore, "[u]nder N.Y. DCL § 276, such [actual] intent 'need not be proven by direct evidence but may be inferred ... (b) where the conveyance is made without fair consideration ...'" *Fromer v. Yogel*, 50 F.Supp.2d 227, 247 (S.D.N.Y.1999) (*quoting De West Realty Corp. v. I.R.S.*, 418 F.Supp. 1274, 1279 (S.D.N.Y.1976)). Thus, "[u]nder this section [276], an intent to defraud is assumed where the conveyance is made without consideration." *William Iselin & Co., Inc. v. Boardwalk Regency Corp.*, 703 F.Supp. 1084, 1088 (S.D.N.Y.1989).

■ 24. For the reasons stated above, the Cassandra Transfer was made without fair consideration. Accordingly, an intent to defraud can be presumed. The Cassandra Transfer can be avoided, and its value can be recovered from the Defendants.

**IV. THE CASSANDRA TRANSFER SHOULD BE AVOIDED, AS ALLEGED IN COUNTS 1, 2, 3, AND 4, PURSUANT TO 11 U.S.C. § 548**

■ 25. To establish a claim for a fraudulent transfer pursuant to section 548 of the Bankruptcy Code, the Trustee must establish that (1) the debtor had an interest in property; (2) a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the debtor received less than a reasonably equivalent value in exchange for such transfer. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

26. Because the Cassandra Transfer was made in late November 1999, within one year of the filing of the petition in this bankruptcy case, July 21, 2000, the Cassandra Transfer is avoidable under 11 U.S.C. § 548 and recoverable against all Defendants under 11 U.S.C. § 550 for the reasons already stated above. *Geron v. Shulman (In re Manshul Construction Corp.)*, 97 Civ. 8851(JGK) 2000 WL 1228866, *43 n. 7, 2000 U.S. Dist. LEXIS 12576, *120 n. 7 (S.D.N.Y. Aug. 29, 2000) ("There is no dispute that if a transfer is fraudulent under the DCL, it is also fraudulent under section 548 of the Bankruptcy Code.")

## V. THE TRUSTEE SHOULD RECOVER THE VALUE OF THE CASSANDRA TRANSFER FROM THE DEFENDANTS, WHO HAVE BEEN UNJUSTLY ENRICHED THEREBY, AS ALLEGED IN COUNT 9

27. On "a claim for unjust enrichment, a plaintiff must show 'that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to plaintiff.' " *Steinmetz v. Toyota Motor Credit Corp.*, 963 F.Supp. 1294, 1307 (E.D.N.Y.1997) (*quoting Reed Int'l Trading Corp. v. Donau Bank AG*, 866 F.Supp. 750, 757 (S.D.N.Y.1994)).

28. Here, as explained above, the evidence shows that the Defendants benefited from the Cassandra Transfer, even though Cassandra had no obligations to them and even though it was the Defendants' actions—allowing DiCaprio out of his agreement and not requiring him to reimburse the Defendants' alleged expenses—that caused their own losses in connection with the failed AMC venture. Accordingly, the Defendants are liable, jointly and severally, to the Trustee for $300,000 in damages for unjust enrichment.

## VI. THE TRUSTEE IS ENTITLED TO PREJUDGMENT INTEREST ON THE FRAUDULENT CONVEYANCE

29. In addition to the value of the Cassandra Transfer, $300,000, the Trustee is entitled to recover from the Defendants prejudgment interest.

30. When awarding prejudgment interest, courts take into consideration: (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. *Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL–CIO*, 955 F.2d 831, 834 (2nd Cir.1992) (citations omitted). Addressing these considerations, full compensation to the estate for the avoided transfer normally requires prejudgment interest to compensate for the value over time of the amount recovered. *See Hirsch v. Steinberg (In re Colonial Realty Co.)*, 226 B.R. 513, 527 (Bankr.D.Conn.1998).

31. Prejudgment interest accrues from the date of the transfer through the date a judgment is entered. *Ackerman v. Kovac (In re All American Petroleum Corp.)*, 259 B.R. 6, 20 (Bankr.E.D.N.Y.2001). In many cases, however, bankruptcy courts award prejudgment interest from the date of the demand or on the date the adversary proceeding was commenced. *See Id.; Official Committee of Unsecured Creditors v. Gold Force, Int'l, Inc. (In re Cyberrebate.com)*, 296 B.R. 639, 645 (Bankr.E.D.N.Y.2003); *Hirsch v. Union Trust Company (In re Colonial Realty Co.)*, 229 B.R. 567, 577 (Bankr.D.Conn.1999).

32. To fully and fairly compensate Cassandra's creditors for their loss—not only of $300,000 that was fraudulently conveyed to the Defendants, but of the use of that money since the date of the demand—the Trustee should be permitted to recover prejudgment interest on the Cassandra Transfer from the date the adversary proceeding was commenced, July 21, 2002, until the date a judgment is entered.

### A. The Trustee Is Entitled to Recover Prejudgment Interest under the Claims Asserted Pursuant to 11 U.S.C. § 544

33. For the reasons set forth below, the applicable interest rate for the

fraudulent conveyance claims asserted under 11 U.S.C. § 544 and the NYDCL is 9% per year.

34. The applicable rate of prejudgment interest on a fraudulent conveyance is determined by the nature of the right asserted. *Committee of Unsecured Creditors of Interstate Cigar Co., Inc. v. Interstate Distribution, Inc. (In re Interstate Cigar Co., Inc.)*, 890–81248–478, 2002 Bankr.LEXIS 781, *8 (Bankr.E.D.N.Y. July 26, 2002) (citing *Pereira v. Goldberger (In re Stephen Douglas, Ltd.)*, 174 B.R. 16, 19, 20 (Bankr.E.D.N.Y.1994)). Because avoidance of the Cassandra Transfer under 11 U.S.C. § 544 is predicated on New York substantive law, New York law is the proper source from which to determine the appropriate interest rate to be applied. *See id.* at *6. *See also Pereira v. Private Brands (In re Harvard Knitwear, Inc.)*, 193 B.R. 389, 399 (Bankr.E.D.N.Y.1996); *In re Stephen Douglas, Ltd.*, 174 B.R. at 22.

35. Pursuant to section 5001(a) of the New York Civil Practice Law and Rules ("CPLR"), "Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property...." CPLR § 5001(a). And, section 5004 of the CPLR provides, "Interest shall be at the rate of nine per centum per annum."

36. "Courts applying § 5001(a) have without qualification awarded interest as a matter of right whenever any tortious conduct causes pecuniary damage to tangible or intangible property interests." *Baker v. Dorfman*, 239 F.3d 415, 425 (2d Cir.2000) (*quoting Mallis v. Bankers Trust Co.*, 717 F.2d 683, 695 (2d Cir.1983)). Moreover, "fraudulent conveyance is but one species of tortious conduct for which the Second Circuit has held that prejudgment interest is recoverable." *Shamis v. Ambassador Factors Corp.*, No. 95 Civ. 9818(RWS) 2001 WL 25720, at *6 (S.D.N.Y. Jan.10, 2001).

37. Thus, under 11 U.S.C. § 544 and the NYDCL, which is the basis for the claims asserted in Counts 5 through 8 of the Complaint, and under the common law claim for unjust enrichment, which is the basis for the claims asserted in Count 9 of the Complaint, the Trustee is entitled to prejudgment interest at the rate of 9% per year on the Cassandra Transfer, accruing from the time the adversary proceeding was commenced, July 21, 2002.

**CONCLUSION**

Based on the facts set forth above, the Court finds that the transfer of $300,000 from Cassandra to AMC is avoidable. The court awards interest at a rate of 9% from the time of the demand, July 21, 2002 to the date an order in accordance with these findings of fact and conclusions of law is entered.

THE TRUSTEE IS DIRECTED TO SUBMIT AN ORDER CONSISTENT WITH THIS DECISION.